562 F.2d 1310
 10 ERC 1529, 183 U.S.App.D.C. 362, 7
Envtl. L. Rep. 20,730
 ASSOCIATION OF AMERICAN RAILROADS, Chesapeake and Ohio
Railway Company, Chicago and Northwestern
Transportation Company, and Southern
Railway Company, Petitioners,
v.
Douglas M. COSTLE, Administrator of the Environmental
Protection Agency and the Environmental Protection
Agency, Respondents,
The State of Illinois, Intervenor.
 No. 76-1353.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 7 June 1977.
Decided 23 Aug. 1977.
 Richard J. Flynn, Washington, D. C., with whom Lee A. Monroe and Joseph B. Tompkins, Jr., Washington, D. C., were on the brief, for petitioners.
 Erica L. Dolgin, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen. and Jeffrey O. Cerar, Atty., E. P. A., Washington, D. C., were on the brief, for respondents.
 Russell R. Eggert, Chicago, Ill., was on the brief, for intervenor.
 Before TAMM and WILKEY, Circuit Judges, and WILLIAM B. JONES,* United States Senior District Judge for the United States District Court for the District of Columbia.
 Opinion for the Court filed by WILKEY, Circuit Judge.
 WILKEY, Circuit Judge:
 
 
 1
 In this petition for review,[1] the Association of American Railroads[2] (AAR) challenges the validity of the action of the Administrator of the Environmental Protection Agency (EPA) in promulgating Railroad Noise Emission Standards limited to rail cars and locomotives operated by surface carriers engaged in interstate commerce by railroad.[3] These regulations were promulgated pursuant to Section 17 of the Noise Control Act of 1972 (the Act) which requires the Administrator to establish emission standards for noise "resulting from operation of the equipment and facilities" of interstate rail carriers.[4] The petitioner does not challenge the validity of the noise emission standards set for rail cars and locomotives; rather, the AAR contends that the Administrator has interpreted the mandate embodied in Section 17 of the Act unlawfully in failing to establish standards for all of the "equipment and facilities" of interstate rail carriers. The EPA, on the other hand, argues that the Act vests the Administrator with discretion to determine which sources of railroad noise are to be regulated at the federal level.
 
 
 2
 After carefully reviewing the language of the Noise Control Act and its legislative history, we conclude that the EPA has misinterpreted the scope of the mandate embodied in Section 17 of the Act through its artificially narrow definition of "equipment and facilities." Accordingly, we reverse the decision of the Administrator to limit the scope of the Railroad Noise Emission Standards and remand the case to the EPA with directions to promulgate noise emission standards in a manner not inconsistent with this opinion.
 
 I. STATUTORY FRAMEWORK
 
 3
 The requirements for the regulation of railroad noise are contained in Section 17 of the Act. In pertinent part, this Section of the Act provides that:[5]
 
 
 4
 (a)(1) Within nine months after October 27, 1972, the Administrator shall publish proposed noise emission regulations for surface carriers engaged in interstate commerce by railroad. Such proposed regulations shall include noise emission standards setting such limits on noise emissions resulting from operation of the equipment and facilities of surface carriers engaged in interstate commerce by railroad which reflect the degree of noise reduction achievable through the application of the best available technology, taking into account the cost of compliance. These regulations shall be in addition to any regulations that may be proposed under section 4905 of this title.
 
 
 5
 (2) Within ninety days after the publication of such regulations as may be proposed under paragraph (1) of this subsection, and subject to the provisions of section 4915 of this title, the Administrator shall promulgate final regulations. Such regulations may be revised, from time to time, in accordance with this subsection.
 
 
 6
 (c)(1) Subject to paragraph (2) but notwithstanding any other provision of this chapter, after the effective date of a regulation under this section applicable to noise emissions resulting from the operation of any equipment or facility of a surface carrier engaged in interstate commerce by railroad, no State or political subdivision thereof may adopt or enforce any standard applicable to noise emissions resulting from the operation of the same equipment or facility of such carrier unless such standard is identical to a standard applicable to noise emissions resulting from such operation prescribed by any regulation under this section.
 
 
 7
 (2) Nothing in this section shall diminish or enhance the rights of any State or political subdivision thereof to establish and enforce standards or controls on levels of environmental noise, or to control, license, regulate, or restrict the use, operation, or movement of any product if the Administrator, after consultation with the Secretary of Transportation, determines that such standard, control, license, regulation, or restriction is necessitated by special local conditions and is not in conflict with regulations promulgated under this section.
 
 
 8
 There are three points concerning the language of Section 17 which deserve mention at this point; an examination of these three points will serve to focus the analysis on the precise issue that forms the basis of the controversy in this case. There is a particularly strong need in this case to focus the discussion at an early stage since the parties, both in their briefs and at oral argument, have devoted much attention to issues which are either beyond peradventure or are not germane to the case in its present posture.[6]
 
 
 9
 First of all, it is clear from the language of Section 17(a)(1) and (2) that the Administrator is under a mandatory duty to establish noise emission standards for interstate rail carriers. The word "shall" is the language of command in a statute,[7] and there is no doubt that the Congress has commanded the Administrator of the EPA to promulgate railroad noise emission standards. In Section 17(a)(1), however, Congress went beyond commanding the Administrator to establish standards and sought to specify the subject matter to be regulated. In so specifying the subject matter, Congress also used the language of command the regulations "shall include " standards setting limits on noise emanating from "the equipment and facilities" of interstate rail carriers.[8] In this sentence the phrase "shall include" refers to and incorporates the phrase "equipment and facilities" as the subject matter which must be included in the mandatory regulations. Thus, both the obligation to promulgate regulations and the subject matter to be regulated are dictated by the statute. Although there is a mandatory duty relative to "equipment and facilities," the statute does not attempt to define the phrase "equipment and facilities" beyond the use of the words themselves.
 
 
 10
 Given this strong mandatory language in the statute, we can brush aside subsidiary and diversionary issues to formulate the issue under review in this case as simply: with respect to the subject matter to be regulated, what is the scope of the Administrator's mandatory duty?[9]
 
 
 11
 The second point to be made concerning the language of Section 17 deals with the issue of preemption. It is clear that, under the Supremacy Clause of the Constitution, federal law can preempt state law in a particular subject area.[10] Congressional intent to preempt state and local regulation must at times be inferred from the overall structure of regulation found in the federal statute; such a need to infer is not present in this case. Section 17(c)(1) of the Act constitutes an explicit and direct preemption clause. Under the terms of this subsection, noise emission regulations relative to "the operation of any equipment or facility" of an interstate rail carrier will preempt state or local regulations dealing with the same sources of noise. In addition, the scope of the preemption provision appears clear; all regulations promulgated pursuant to Section 17(a)(1) and (2) are to have preemptive effect. That is, if a regulation comes within the scope of the mandatory duty specified in Section 17(a)(1) and (2), the regulation then displaces inconsistent state or local laws.
 
 
 12
 Thus, the existence and scope of federal preemption are not directly at issue in this case; the former is beyond doubt, while the latter is dictated by the scope of the mandatory duty to establish standards (which is the focus of this case).
 
 
 13
 The third and final point to be made concerning the language of Section 17 at this time concerns the provision for local variances under Section 17(c)(2) of the Act. Under this provision the Administrator may, after consultation with the Secretary of Transportation, allow states or localities to establish and enforce standards if such standards are "necessitated by special local conditions and (are) not in conflict with regulations promulgated under this section."[11] This provision for local variances has no effect on the scope of the mandatory duty outlined in Section 17(a), nor does it alter the preemption provisions of Section 17(c)(1); in fact, the nature of this provision would seem to confirm preemption. Section 17(c)(2) performs a valuable function in its recognition that local conditions may dictate some degree of flexibility in the approach to noise control. The provision does not, however, limit the scope of the Administrator's mandatory duty or the preemptive effect of the regulations issued pursuant to that duty.
 
 
 14
 In summary, by virtue of the language and structure of Section 17 of the Act, the relevant question for purposes of this analysis concerns the scope of the mandatory duty to regulate railroad noise. In particular, this scope is to be defined by reference to the phrase "equipment and facilities" in Section 17. Before turning to an exposition of what we believe to have been the Congressional intent behind this phrase, we shall examine the definition provided by the Administrator during the course of the rulemaking proceedings here under review.
 
 II. PROCEDURAL BACKGROUND
 
 15
 The first formal step taken by EPA to implement Section 17 was the issuance of an advance notice of proposed rulemaking, which announced EPA's intent to develop regulations and invited the participation of all interested parties.[12] The comment period was subsequently extended to 1 June 1973.[13] On 3 July 1974 EPA issued a notice of proposed rulemaking in which the agency announced its intention to regulate rail cars and locomotives but not other railroad equipment or facilities.[14] The Administrator provided the following rationale for so limiting the regulations:[15]
 
 
 16
 Many railroad noise problems can best be controlled by measures which do not require national uniformity of treatment to facilitate interstate commerce at this time. The network of railroad operations is imbedded into every corner of this country, including rights-of-way, spurs, stations, terminals, sidings, marshaling yards, maintenance shops, etc. Protection of the environment for such a complex and pervasive industry is not simply a problem of modifying noisy equipment, but get down into the minutiae of countless daily railroad operations at thousands of locations across the country. The environmental impact of a given railroad operation will vary depending on whether it takes place, for example, in a desert or adjacent to a residential area. For this reason, EPA believes that State and local authorities are better suited than the Federal government to consider fine details such as the addition of sound insulation or noise barriers to particular facilities, or the location of noisy railroad equipment within those facilities as far as possible from noise- sensitive areas, etc. There is no indication, at present, that differences in requirements for such measures from place to place impose any significant burden upon interstate commerce. At this time, therefore, it appears that national uniformity of treatment of such measures is not needed to facilitate interstate commerce and would not be in the best interest of environmental protection.
 
 
 17
 The national effort to control noise has only just begun, however, and it is inevitable that some presently unknown problems will come to light as the effort progresses. Experience may teach that there are better approaches to some aspects of the problem than those which now appear most desirable. The situation may change so as to call for a different approach. Section 17 of the Noise Control Act clearly gives the Administrator of the Environmental Protection Agency authority to set noise emission standards on the operation of all types of equipment and facilities of interstate railroads. If in the future it appears that a different approach is called for, either in regulating more equipment and facilities, or fewer, or regulating them in a different way or with different standards consistent with the criteria set forth in Section 17, these regulations will be revised accordingly.
 
 
 18
 After publication of the proposed regulations, EPA made available a detailed "Background Document" for the regulations; this document is significant for the candor and frankness with which it explains the agency's decision to limit its regulation.[16] After this, a public hearing was held and further written comments were solicited and received.[17] The AAR submitted written comments on 27 August 1974 in which the organization put forth the same arguments being pursued in this appeal.[18] The EPA rejected these arguments and published the final, but limited, regulations on 14 January 1976. This petition for review of the final regulations was then timely filed on 14 April 1976.[19]
 
 
 19
 There are two major themes in the EPA's justification for limiting its regulation which should be identified at this point. The first concerns the issue of timing; EPA has repeatedly stated that it is limiting the subject matter of its noise standards "at this time." The agency has during the course of its administrative proceedings specifically reserved the option to regulate all aspects of railroads "equipment and facilities" in the future.
 
 
 20
 The second theme is related to the first; while declining to regulate additional equipment and facilities at this time, the Administrator explicitly or impliedly encouraged state and local jurisdictions to adopt noise emission standards for some types of equipment and facilities. As EPA stated,[20]
 
 
 21
 "Although the EPA does not currently propose to regulate retarder noise, it does recommend that local jurisdictions establish regulations which require railroads to utilize barrier technology where needed and where both practical and feasible . . .
 
 
 22
 "They (local and state jurisdictions) may adopt and enforce noise emission standards on other pieces of equipment not covered by EPA regulations, such as retarders and railroad construction equipment . . .
 
 
 23
 "State and local governments may enact noise emission standards for facilities which EPA has not regulated. However, . . . where federally regulated equipment is a noise contributor in a facility on which a State or local government proposes to set a noise emission standard, such as a marshalling yard, such regulation may or may not be preempted . . .
 
 
 24
 ". . . EPA believes that design or equipment standards on federally regulated equipment viz., locomotive and rail cars are preempted. Design or equipment standards on other pieces of equipment such as retarders or cribbing machines, are not preempted. Similarly, design standards on facilities not federally regulated are not preempted, even though locomotives and rail cars may operate there, because they do not require the modification of locomotives or rail cars. An example of this type of regulation would be a local ordinance requiring that noise barriers be installed along the rights of way running through that community."
 
 
 25
 Thus, although EPA recognized the need for additional regulation, the agency did not take it upon itself to meet this need through EPA-sponsored regulations. In addition, the encouragement of local regulation was subject to the EPA's reservation of power to regulate in those same areas in the future. This facet of the agency's position will assume a prominent role in our analysis in Part III, infra.
 
 
 26
 In summary, the administrative process described above resulted in standards regulating noise from only three sources: 1) locomotive operation under stationary conditions;[21] 2) locomotive operation under moving conditions;[22] and 3) rail car operations.[23] No other types of railroad equipment and no railroad facilities at all are within the coverage of the promulgated standards. Specifically, the following "equipment and facilities" are excluded from federal regulation: horns, bells, whistles and other warning devices; repair and maintenance shops, terminals, marshalling yards, and rail car retarders; special purpose equipment, such as cranes, derricks, and other types of maintenance-of-way equipment; and track and rights-of-way.[24] The propriety of excluding these sources of noise from regulation in light of the statutory mandate in Section 17(a) of the Act will now be examined.
 
 III. ANALYSIS
 A. Statutory Language
 
 27
 1. Section 17(a)(1). The starting point for an analysis of the scope of the subject matter to be regulated pursuant to the Administrator's mandatory duty to publish noise emission regulations must be the language of Section 17(a) (1). As noted previously, "shall include" refers to "the equipment and facilities" in this context;[25] the definition of the latter phrase dictates the scope of the mandatory subject matter. We believe that the reference to "the equipment and facilities" is unambiguous. The plain meaning of this phrase yields a definition that would, in the absence of any contradictory evidence, subsume all such equipment and facilities. There is absolutely no indication in Section 17(a)(1) that Congress intended to vest discretion in the EPA to decide which of the equipment and facilities would be subject to regulation. Nothing in the statute diminishes or qualifies the generality of these two key words equipment and facility. Nothing in the statute states that only certain kinds of equipment or facilities need to be regulated. The plain and natural meaning of the phrase "the equipment and facilities" is that the power of the EPA is plenary with respect to those objects and places customarily thought to be included in the definition of the phrase. To read this language otherwise would be to distort a relatively clear signal from the national legislature. Indeed, in the context of this case, the EPA chose not to regulate any "facilities" at all; this action in effect reads this word out of the statute. We are not prepared to label this word as being superfluous to the statutory mandate.[26]
 
 
 28
 The EPA presents only one argument with respect to the statutory language in Section 17(a)(1). The agency contends that "(i)f Congress had meant to require EPA to regulate all equipment and facilities it could easily have said so by using the word 'all' rather than the word 'the.' "[27] This is perhaps the weakest of all statutory construction arguments, particularly where, as here, the proponent of the argument puts forth alternative language which Congress should have used which has substantially the same meaning as the language which Congress did employ. The principle being contended for by the EPA with respect to the language of Section 17(a)(1) has no limits; it is the last refuge for those who find themselves in the unenviable position of having to argue against the plain meaning of statutory language. Although EPA can draw no support from the language of Section 17(a)(1), the agency seeks to establish the existence of discretion to choose among various equipment and facilities by reference to the language of the preamble of the Act.[28]
 
 
 29
 2. The Preamble. The EPA makes much of the fact that the preamble to the Act states that
 
 
 30
 while primary responsibility for control of noise rests with State and local governments, Federal action is essential to deal with major noise sources in commerce control of which require national uniformity of treatment.[29]
 
 
 31
 EPA would have us read this language as if it said that the Federal government can regulate only "major noise sources."
 
 
 32
 The EPA argument based on the language in the preamble is based on an erroneous perception of the operation and significance of such language. A preamble no doubt contributes to a general understanding of a statute, but it is not an operative part of the statute and it does not enlarge or confer powers on administrative agencies or officers.[30] Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by language in the preamble. The operative provisions of statutes are those which prescribe rights and duties and otherwise declare the legislative will. In the context of this case, the operative provisions of the statute which declare the will of Congress with respect to railroad noise emissions are those contained in Section 17 of the Act. We find the reference to "the equipment and facilities" in Section 17(a)(1) to be unambiguous and, therefore, do not look to the preamble for guidance as to the legislative intent.
 
 B. Legislative History
 
 33
 Our conclusion that the language of Section 17(a)(1) itself is an unambiguous reference to all "equipment and facilities" forecloses the necessity of looking to the legislative history for resolution of this issue. In the interest of thoroughness, however, we have scrutinized the legislative history and believe that it is consistent with our reading of the language of the Act. In addition, the legislative history provides an important insight into why the justification offered by the EPA for the narrowness of the scope of its regulations is incorrect.
 
 
 34
 The only legislative Committee Report to touch on the provisions relating to railroad noise regulation is the Report of the Senate Committee on Public Works.[31] The Report of the House Committee on Interstate and Foreign Commerce, accompanying the House noise control bill (H.R. 11021),[32] contains no mention of railroad noise emissions because the House bill did not contain a section on railroad noise either as introduced or as first passed by the House.
 
 
 35
 The Senate Committee Report summarized the railroad section of the law as follows:[33]
 
 
 36
 "Part B Railroad Noise Emission Standards
 
 
 37
 This part (sections 511 through 514) provides a Federal regulatory scheme for noise emissions from surface carriers engaged in interstate commerce by railroad. The Administrator of the Environmental Protection Agency is required to publish within 9 months after enactment and promulgate within 90 days after publication noise emission standards for railroad equipment and facilities involved in interstate transportation, including both new and existing sources. Such standards must be established on the basis of the reduction in noise emissions achievable with the application of the best available technology, taking into account the cost of compliance.
 
 
 38
 Standards take effect after the period the Administrator determines necessary to develop and apply the requisite technology, and are implemented and enforced through the safety inspection and regulatory authority of the Secretary of Transportation, as well as through Title IV.
 
 
 39
 Based on the interrelationship between the need for active regulation of moving noise sources and the burdens imposed on interstate carriers by differing State and local controls, the Federal regulatory program for railroads under this part completely preempts the authority of State and local governments to regulate such noise after the effective date of adequate Federal standards, except where the Administrator determines it to be necessitated by special local conditions or not in conflict with regulations under this part."
 
 
 40
 Although the language in the report offers no insight into the meaning of the phrase "equipment and facilities," it does provide evidence as to the major policy justification for the broad preemptive effect accorded to the railroad noise emission standards. Congress was clearly concerned about "the burdens imposed on interstate carriers by differing State and local controls . . . ." This concern was expressed repeatedly in the Senate debate on the Act. Two excerpts from this debate serve to illustrate this concern:
 
 Senator Randolph:
 
 41
 "I also bring to the attention of the Senate the provisions in title V of S. 3342, which establishes a regulatory framework for noise from interstate trucks and buses and the operations of railroads. Here, as well as in the area of product noise emission standards, the transportation industry is faced with the prospect of conflicting noise control regulations in every jurisdiction along their routes. It is completely inappropriate for interstate carriers or interstate transportation to be burdened in this way. The committee met the need for active legislation on moving noise sources by requiring controls on noise from all interstate trucks and buses and railroads, including existing equipment which would not otherwise be subject to produce noise emission standards under title IV and the patterns of operations of such carriers. After the effective date of an adequate Federal regulation program, the authority of State and local governments to regulate noise from interstate trucks and buses or trains is completely preempted, except where the Administrator determines it would be necessitated by special local conditions or in no conflict with the Federal requirements."[34]"Mr. HARTKE. Mr. President, one of the basic purposes of title V of this bill, as explained in the committee report, is to assure the maximum practical uniformity in regulating the noise characteristics of interstate carriers such as the railroads and motor carriers which operate from coast to coast and through all the States, and in hundreds of communities and localities.
 
 
 42
 "Without some degree of uniformity, provided by Federal regulations of countrywide applicability which will by statute preempt and supersede any different State and local regulations or standards, there would be great confusion and chaos. Carriers, if there were not Federal preemption, would be subject to a great variety of differing and perhaps inconsistent standards and requirements from place to place. This would be excessively burdensome and would not be in the public interest."[35]
 
 
 43
 This concern for "maximum practical uniformity" is certainly consistent with a broad definition of "equipment and facilities." But the EPA has put forth a curious motion as to which equipment and facilities are in need of such uniform treatment with respect to noise emission standards.
 
 
 44
 EPA justifies its narrow view of equipment and facilities by arguing that if a source of noise is subject to the regulation of only one jurisdiction, there is no need for national uniformity. EPA believes that national uniformity is needed only in those situations in which the noise source is potentially subject to noise regulation by more than one jurisdiction (such as locomotive or rail cars).[36] This view ignores the fact that, although a physical source of noise for instance, a particular yard or terminal ("facilities") may be permanently located in only one jurisdiction, the railroad that owns it will own other yards and terminals in many other jurisdictions through which its system extends. The railroad itself (the carrier specified in Section 17(a)(1) of the Act), as distinguished from the single yard, will be subject to conflicting or differing noise regulations of the jurisdictions in which all of the various yards are located. Such multiple exposure could easily create the type of burdens which Congress sought to avoid in the Noise Control Act. By giving the phrase "the equipment and facilities" its natural meaning, nationally uniform regulations will extend to the various elements subsumed in this phrase, in furtherance of this major policy underlying the Act.
 
 
 45
 We emphasize that the discussion in this section of the opinion concerns a policy justification underlying the Act and does not focus on the statutory language. There is no language in Section 17 which mandates that the Administrator regulate only those equipment and facilities in need of national uniform treatment. But this question of uniformity is supportive of our reading of the contested phrase, and the manner in which the Administrator applied the uniformity concept is important to an understanding of the EPA's earlier, limited action. It is for these reasons that we have discussed this issue.
 
 C. Other Arguments
 
 46
 The analysis thus far in Part II has focused on the statute itself and the legislative history. We now address several additional arguments raised by the EPA.
 
 
 47
 The EPA argues that its interpretation of the Noise Control Act should be accorded deference by a reviewing court because it is the agency charged with administering the Act.[37] While it is an established principle of administrative law that reviewing courts will generally "show 'great deference to the interpretation given (a) statute by the officers or agency charged with its administration,' "[38] this principle has no application where, as here, the agency has misinterpreted its statutory mandate.[39] In such cases of misinterpretation, it is our duty to correct the legal error of the agency as we have done here. In this regard, we also note that the Interstate Commerce Commission, the Department of Transportation, and the Department of Commerce three federal agencies which can all lay claim to considerable expertise relative to the railroad industry and its role in interstate commerce all strongly disagreed with the EPA's decision not to regulate all "equipment and facilities" of interstate rail carriers.[40] We point to this as additional evidence that our failure to defer to the agency decision in this case is not unwarranted.
 
 
 48
 The EPA argues quite strenuously that "practical factors" compel the conclusion that Congress did not intend all railroad equipment and facilities to be regulated.[41] EPA contends that "(i)t is inconceivable that Congress intended EPA to investigate and control every inconsequential piece of railroad equipment. . . ."[42] EPA then proceeds to list a variety of sources which it believes would be encompassed by the AAR's position in this case. EPA raises the specter that it will have to regulate elevators, air conditioners, typewriters, telephones, parking lots, and delivery vans because these sources are subsumed under a strict, literal interpretation of the phrase "equipment and facilities."[43]
 
 
 49
 We do not find this argument convincing. The courts are, of course, concerned with the consequences of the decisions which they render; they will examine these consequences as a factor in determining whether to grant the relief requested by the complaining party in a particular case. The consequences of the position we take in this case are not of the variety that cast doubt on the wisdom of the decision, however. This is because the position advocated by EPA counsel in this case is an artificial one; the AAR has not contended that the EPA must thrust its presence into every minute detail of railroad office buildings,[44] nor is such a position required by what appears to be the customary definition of "equipment and facilities" in the railroad industry.
 
 
 50
 The EPA itself (as opposed to EPA counsel in this case) has shown that it is capable of defining "equipment and facilities" in a realistic and reasonable manner. In Section 5 of its "Background Document for Railroad Noise Emission Standards," the EPA has identified broad categories of railroad noise sources in order "to identify (the) types of equipment and facilities requiring national uniformity of treatment."[45] The agency then proceeds to list the following categories: office buildings; repair and maintenance shops; terminals, marshalling yards, humping yards, and railroad retarders; horns, whistlers, bells and other warning devices; special purpose equipment (listing nineteen pieces of such equipment); track and right-of-way design; and trains (locomotives and rail cars).[46] As noted previously, the EPA chose to regulate only this last category relating to locomotives and rail cars.[47] With respect to each of the additional categories of railroad equipment and facilities that generate noise, the EPA declined to regulate but reserved the option to establish standards in the future.[48]
 
 
 51
 Two points of significance emerge from the foregoing discussion. First, the EPA has demonstrated that it is capable of defining the phrase "equipment and facilities" in a manner consistent with customary usage of the phrase in the industry. Congress often does not specify in detail phrases that have an established meaning within a particular industry; such definitions are best developed with reference to the actual context of the regulated industry in question. We stress that the task of defining "equipment and facilities" is a matter to be accomplished within the structure of the EPA's rulemaking procedures; we do not undertake to provide a detailed definition in this opinion. We do, however, conclude that the EPA has interpreted its statutory mandate too narrowly in regulating only locomotives and rail cars, and no facilities at all. The EPA counsel have offered us an extreme definition of "equipment and facilities" in an attempt to have us reject the AAR's position. The EPA itself has shown that it can bring a measure of reason to a discussion of this definitional issue; on this on remand we rely.
 
 
 52
 The second point concerns EPA's insistence that it has the option to regulate the enumerated "equipment and facilities" in the future. In our view, the EPA has virtually admitted the error of its interpretation of Section 17 in making this argument. Section 17(a)(1) makes no provision for a "phasing in" of the required regulations over a period of time; the provision does not have a temporal element in which the agency determines when to initiate the federal regulatory machinery. There is a temporal element in Section 17(a)(2); this provision states that "such regulations may be revised, from time to time . . . ."[49] In this context, "such regulations" refers to the mandatory regulations prescribed in Section 17(a)(1). Section 17(a)(2) therefore provides for the "fine tuning" of the mandatory regulations; there is no provision for a delay in the timing of the original issuance of the mandatory standards themselves.
 
 
 53
 Therefore, if a certain subject matter is properly included within the term "equipment and facilities," the EPA has jurisdiction over the subject matter. If the EPA has such jurisdiction, it must exercise it in accordance with the mandate of Section 17(a)(1). In its "Background Document" the EPA has claimed future jurisdiction over a broad range of "equipment and facilities;"[50] this claim in effect admits that the phrase properly encompasses a much broader range of objects and places. This admission in turn dictates the conclusion that the original regulations were much too narrow in scope.
 
 
 54
 In its construction of Section 17(a)(1), the EPA has attempted to secure for itself the best of both worlds; that is, to limit current regulation while reserving plenary power to regulate in the future. This is perhaps an understandable effort to introduce an element of flexibility into the promulgation of noise emission standards. It is not, however, for us as a reviewing court to add this dimension of flexibility to the statutory framework. Congress has dictated that the EPA regulate "the equipment and facilities" of interstate rail carriers. Congress has not provided the agency with the type of discretion it evidently desires and contends for in this case. We are bound to effectuate the legislative will and we perceive it to be unambiguous in this context. If the EPA desires an element of flexibility in its operations, the agency must look to the Congress and not to the courts.
 
 
 55
 In addition to the arguments already presented, we perceive a highly unfavorable consequence of EPA's position that it can refrain to regulate at this time while reserving the option to regulate in the future. As noted previously, the EPA has encouraged local jurisdictions to regulate particular noise sources which it (the EPA) chooses not to regulate at this time. If the localities take this suggestion seriously, they may well invest considerable resources and time in developing and promulgating local noise ordinances. But the EPA claims the authority to issue regulations covering the same noise sources at any time in the future. It is clear that these EPA-issued regulations would, under Section 17(c)(1) of the Act, preempt the locally developed standards. Thus, the localities could not be sure when and if a federal regulation would displace their own and with it the time and resources devoted to the promulgation of the local standard. We believe that the structure of Section 17 of the Act comprehends some consideration for the localities in this regard.
 
 
 56
 If the federal level issues all of its regulations concerning "equipment and facilities" at one time; the localities can plan their own activities in the area of noise regulation with increased certainty and confidence that their efforts will not go for naught. Also, once the federal regulations are issued, the localities will be able to discern whether or not they should attempt to trigger the variance provisions found in Section 17(c)(2) of the Act. Therefore, we believe that our decision in this case is consistent with the overall structure of the Act as it applies to railroad noise emission standards.
 
 IV. RELIEF
 
 57
 Section 10(e) of the Administrative Procedure Act states that[51]
 
 
 58
 (t)o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall
 
 
 59
 (1) compel agency action unlawfully withheld or unreasonably delayed.
 
 
 60
 Having concluded that the Administrator of the EPA misinterpreted the clear statutory mandate to regulate "the equipment and facilities" of interstate rail carriers, we direct that the Administrator reopen the consideration of Railroad Noise Emission Standards and promulgate standards in accordance with the statutory mandate as interpreted herein. Several observations concerning the nature of the inquiry on remand are in order.
 
 
 61
 Although the Administrator construed the term "equipment and facilities" in a narrow and artificial manner, we do not in this opinion dictate what we believe to be a proper definition of the term. Rather, we believe that Congress intended for this definition to be developed by the agency in a manner that is consistent with the customary usage of the phrase in the railroad industry.[52] The EPA has shown that it has a realistic understanding of what is included within railroad "equipment and facilities," and we would expect them to apply this same realistic approach on remand. This does not mean that they must adopt the precise definition outlined in Section 5 of the Background Document; it does mean that the realities of the railroad industry must govern the definition, not the predilections of the agency as to what it is prepared to regulate.
 
 
 62
 Second, nothing we do herein affects the degree of regulation which the Administrator deems desirable in a particular context. We are concerned at this point only that the Administrator broaden the scope of the subject matter regulated so as to bring the coverage of the regulations in line with the Congressional mandate in Section 17 of the Act. The particular manner in which the "equipment and facilities" are regulated is a matter which rests, in the first instance, with the Administrator. This action is, of course, reviewable, but under a different standard and at a future date.
 
 
 63
 Third, there is the matter of the time within which the Administrator must promulgate the regulations concerning "equipment and facilities." The original statutory command was that the Administrator publish proposed regulations within nine months from 27 October 1972;[53] these proposed regulations were then to be promulgated as final regulations within ninety days after the publication of the proposed regulations.[54] We believe that this original timetable evidences a Congressional concern that the regulations be issued expeditiously. Accordingly, we believe that our mandate should embrace this concern for a prompt treatment of the noise emission standards. Therefore, we direct that the consideration on remand proceed as promptly as possible and, in any event, that the final regulations be issued within one year from the date on which the mandate in this case is issued.
 
 
 64
 Fourth, and finally, our holding in this case does not affect the validity of the individual Railroad Noise Emission Standards already issued. These may continue in effect. Our sole directive is that the EPA broaden the scope of its regulations by defining "the equipment and facilities" of interstate rail carriers in a manner consistent with the usual and customary understanding of the phrase in the railroad industry.
 
 
 65
 So Ordered.
 
 
 
 *
 Sitting by designation pursuant to Title 28, U.S.C. § 294(c)
 
 
 [1]
 This petition for review is properly before the court pursuant to 42 U.S.C. § 4915
 
 
 [2]
 The State of Illinois was allowed to intervene as a party respondent by order of this court on 18 May 1976
 
 
 [3]
 The regulations are stated at 40 C.F.R. §§ 201.11, 201.12, 201.13
 
 
 [4]
 42 U.S.C. § 4916
 
 
 [5]
 Id
 
 
 [6]
 For example, the petitioner devotes substantial energy to the question of whether the Act has preemptive effect. See Brief of Petitioners at 9-32. The Act clearly has such an effect; see text at notes 10, 35, and 36, infra
 The respondents focus on the issue of whether the EPA has exercised its discretion in a reasonable manner; see Brief for Respondents 26-37. The discussion by respondents assumes that discretion is vested in the EPA; we have concluded that it does not and, therefore, this discussion of the reasonableness of the exercise of discretion is not relevant.
 
 
 [7]
 See, e. g., Boyden v. Comm. of Patents, 142 U.S.App.D.C. 351, 441 F.2d 1041 (1971)
 
 
 [8]
 42 U.S.C. § 4916(a)(1)
 
 
 [9]
 We emphasize that the question as to the degree of regulation to be applied to various noise sources is not before us in this case. The sole issue which we address concerns the question as to what is to be regulated
 
 
 [10]
 See, e. g., Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)
 
 
 [11]
 42 U.S.C. § 4916(c)(2)
 
 
 [12]
 38 Fed.Reg. 3086
 
 
 [13]
 38 Fed.Reg. 10644
 
 
 [14]
 39 Fed.Reg. 24580
 
 
 [15]
 Id. at 24580-81
 
 
 [16]
 The document is reproduced in the Joint Appendix (J.A.) at 28-51. See also text and notes at notes 45 to 48, infra
 
 
 [17]
 39 Fed.Reg. 24585
 
 
 [18]
 J.A. at 117-160
 
 
 [19]
 See 42 U.S.C. § 4915
 
 
 [20]
 See J.A. at 18, 24-25
 
 
 [21]
 40 C.F.R. § 201.11
 
 
 [22]
 Id. at § 201.12
 
 
 [23]
 Id. at § 201.13
 
 
 [24]
 This listing is not meant to be an exhaustive compilation of the subject matter included within the phrase "equipment and facilities." The definition of this term must be made by the agency with a realistic reference to the definition of the term customarily employed in the railroad industry. See text and notes at notes 45 to 48, infra
 
 
 [25]
 See text and notes at notes 7 to 8, supra
 
 
 [26]
 Of course, the EPA has reserved the option to regulate "facilities" in the future (see note 15, supra ). The EPA thus believes that it can choose the timing of its regulations, a proposition with which we disagree. See text and notes at notes 49 to 50, infra
 
 
 [27]
 Brief for Respondents at 10
 
 
 [28]
 Respondents refer us to other statutory language in various subsections of Section 17; see Brief for Respondents at 12-14. We find these arguments to be clearly frivolous and insubstantial and therefore do not address them in detail in this opinion
 
 
 [29]
 42 U.S.C. § 4901(a)(3)
 
 
 [30]
 See, e. g., Yazoo Railroad Co. v. Thomas, 132 U.S. 174, 188, 10 S.Ct. 68, 33 L.Ed. 302 (1889)
 
 
 [31]
 S. Rep. No. 92-1160, 92d Cong., 2d Sess. (1972) U.S.Code Cong. & Admin.News 1972, p. 4655
 
 
 [32]
 H. Rep. No. 92-842, 92d Cong., 2d Sess. (1972)
 
 
 [33]
 S. Rep. No. 92-1160, supra, note 31, at 18-19
 
 
 [34]
 118 Cong.Rec. 35412 (1972) (Remarks of Senator Randolph)
 
 
 [35]
 118 Cong.Rec. 35881 (1972) (Remarks of Senator Hartke)
 
 
 [36]
 See Background Document, J.A. at 37-45
 
 
 [37]
 See Brief for Respondents at 7-8
 
 
 [38]
 Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)
 
 
 [39]
 See, e. g., Freeman v. Morton, 162 U.S.App.D.C. 358, 499 F.2d 494 (1974)
 
 
 [40]
 See J.A. at 214-16, 210, 189
 
 
 [41]
 Brief for Respondents at 22
 
 
 [42]
 Id. at 23
 
 
 [43]
 Id. at 22-23
 
 
 [44]
 Reply Brief of Petitioners at 3-5
 
 
 [45]
 Background Document, J.A. at 37
 
 
 [46]
 Id., J.A. at 37-44
 
 
 [47]
 See text at notes 14 to 19, supra
 
 
 [48]
 See note 46, supra
 
 
 [49]
 42 U.S.C. § 4916(a)(2)
 
 
 [50]
 See note 46, supra
 
 
 [51]
 5 U.S.C. § 706
 
 
 [52]
 This definition will, of, course, be reviewable in the courts
 
 
 [53]
 42 U.S.C. § 4916(a)(1)
 
 
 [54]
 Id. at § 4916(a)(2)