**CONSOLIDATED RAIL CORPORATION, a Pennsylvania Corporation, Plaintiff,**

v.

**The CITY OF DOVER, a Municipal Corporation of the State of Delaware, Defendant.**

**Civ. A. No. 77–387.**

United States District Court, D. Delaware.

April 26, 1978.

Robert K. Payson and Christopher J. Warner, of Potter, Anderson & Corroon, Wilmington, Del., Henry R. Horsey, of Morris, James, Hitchens & Williams, Dover, Del., for Consolidated Rail Corp.

Nicholas H. Rodriguez, of Schmittinger & Rodriguez, P.A., Dover, Del., for The City of Dover.

## OPINION

STEEL, Senior District Judge:

This action was instituted in this court on October 7, 1977, by Consolidated Rail Corporation ("Conrail") seeking permanently to enjoin the City of Dover from enforcing a noise abatement ordinance against Conrail because of its railroad operations within the limits of the City of Dover. On the same date the City of Dover brought an action against Conrail in the Delaware Court of Chancery, in and for Kent County, seeking to enjoin as a public nuisance Conrail's operations within the City of Dover. The Chancery action was removed to this court on October 11, 1977, and thereafter was consolidated with the action filed by Conrail in this court. On October 12, 1977, this Court entered a Temporary Restraining Order enjoining the City of Dover from enforcing the noise abatement ordinance against Conrail. By agreement among the Court and the parties the preliminary injunction stage was bypassed, and a final hearing was held on December 6 and 7, 1977. To expedite matters the Court requested the parties to file briefs with respect to the legal issues framed by the complaints and answers prior to briefing factual issues which were developed at the final hearing.

This litigation is the result of the activities of locomotives and freight cars belonging to Conrail, an interstate carrier, in the marshalling and switching yard adjoining New Burton Road in the City of Dover. The City claims that this activity is causing excessive, unnecessary or unusually loud noise that annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of the residents adjoining New Burton Road who are affected by the noise and violates its noise abatement ordinance. In the federal action Conrail seeks a permanent injunction against the enforcement of Dover's noise ordinance against Conrail. In the state action the City claims that the noise generated by railroad operations in switching or marshalling yards constitutes a public nuisance as does the fact that railroad cars carrying hazardous materials or noxious chemicals have been stored in the marshalling yard.

## THE FEDERAL ACTION

The action initially brought by Conrail in this court sought to enjoin the City of Dover from enforcing an ordinance, section 20–12 of the Dover Municipal Code, which became effective on September 29, 1977. That ordinance provides:

"SECTION 20–12. *EXCESSIVE NOISE PROHIBITED.* It shall be unlawful for any person to make, continue, or cause to be made or continued any excessive, unnecessary or unusually loud noise or any noise which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others, within the limits of the City. The following acts, among others, are declared to be loud, disturbing and unnecessary noises in violation of the Section, but said enumeration shall not be deemed to be exclusive, namely:

. . . . .

(O) *Railroads.* The causing, permitting or continuing of any excessive, unnecessary or avoidable noise in the opera-

tion of a railroad. The creation of excessive noise by a railroad or in railroad operations by way of moving or switching of cars or trains or by any other means in or adjoining a residential area between the hours of eleven (11) o'clock P.M. and seven (7) o'clock A.M. which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others within the City limits shall be *prima facie* evidence of a violation of this Section."

Conrail argues that the City may not enforce section 20–12 because the Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.* (Supp. IV 1977), and regulations thereunder have preempted for exclusive federal regulation the subject of the noise which the ordinance purports to regulate.

42 U.S.C. § 4916(c)(1) (Supp. IV 1977) provides:

"(c)(1) Subject to paragraph (2)[1] but notwithstanding any other provision of this chapter, after the effective date of a regulation under this section applicable to noise emissions resulting from the operation of any equipment or facility of a surface carrier engaged in interstate commerce by railroad, no State or political subdivision thereof may adopt or enforce any standard applicable to noise emissions resulting from the operation of the same equipment or facility of such carrier unless such standard is identical to a standard applicable to noise emissions resulting from such operation prescribed by any regulation under this section."

Section 4916(a)(1) directs the Administrator to publish noise emission regulations for railroads engaged in interstate commerce. Pursuant to this mandate the Administrator published regulations containing noise emission standards which became effective October 1, 1977. These regulations, so far as germane, are found in 40 C.F.R. §§ 201.-

11, 201.12 and 201.13 (1976).[2] These prescribe the standards of noise which are acceptable for (1) operation of locomotives under stationary conditions; (2) operation of locomotives under moving conditions; and (3) operation of rail cars. They express in terms of decibels the acceptable standards of noise under various conditions.

By contrast in the Dover ordinance the standards of permissible noise are expressed in terms of generalities and described with respect to their subjective effect upon persons within the limits of the city.[3] Obviously these standards are not "identical" with those prescribed in terms of decibels in the federal regulations. Because of this, section 4916(c) by its plain terms prohibits Dover from enforcing the ordinance.

Dover takes issue with this conclusion. It argues that no federal regulations of any kind have been promulgated which deal with the noise sources against which the ordinance is directed.

These sources are "railroad operations by way of moving or switching cars or trains or by other means in or adjoining a residential area between the hours of eleven (11) o'clock P.M. and seven (7) o'clock A.M." The City argues that it is incongruous for the Court to hold that the standards of noise in the ordinance are not identical with the federal standards when there are no federal standards applicable to moving or switching operations in a marshalling yard with which the ordinance can be compared.

■ The soundness of this argument depends upon the interpretation which the Administrator of the EPA intended that the federal noise regulations should have; that is whether they were intended to be applicable to all phases of railroad operations or only those outside of switching activities in the marshalling yard.

---

1. Paragraph (2) is not presently relevant.

2. Exhibit A to Doc. 1.

3. It is assumed, without deciding, for purposes of the present discussion that the ordinance

does not violate the due process clause of the Fourteenth Amendment because of the vagueness of the noise standards which the ordinance imposes.

So far as the language of sections 201.11, 201.12 and 201.13 is concerned, the scope of the regulations is all embracing. The noise level standards of the regulations cover by the generality of their terms locomotives under moving and stationary conditions and rail car operations regardless of the area from which the noise emanates. Section 201.10 states that subparagraph (b) (which includes the cited regulations) shall be applicable to "all locomotives" and "all rail cars" subject to exceptions not presently relevant.[4] Sections 201.11–.13 together provide that "no carrier shall operate any locomotive (stationary or moving)" or "any rail car" to which the regulations are "applicable." The applicability of the regulations is to noise level limitations, not to area of operations restrictions. In this regard the language of the regulations makes no exception to their application. For the Court to construe the regulations as excluding switching activities in a marshalling yard would be inconsistent with the generality of the language of the regulations, particularly since the EPA took pains expressly to provide for exceptions to their reach of the regulations when exceptions were intended.

The conclusion that the federal regulations are applicable to the noise generated by the locomotives and railway cars in the marshalling yard adjoining Dover finds support in the enforcement regulations promulgated by the Secretary of Transportation under 42 U.S.C. § 4916(b) (Supp. IV 1975) to insure compliance with the noise standards promulgated by the Administrator of the EPA.[5]

The railroad noise emission compliance regulations promulgated by the Administrator of the Federal Railroad Administration appear in 42 Fed.Reg. 42,343 to 42,349 (1977). Prior to the regulations becoming effective, the Administrator of the FRA, on October 1, 1977, noted that some question had arisen as to the scope of the applicability of the noise compliance rules under section 210.3.[6] He said, "These rules are intended to be coextensive with the EPA standards and the Act. The scope of the EPA standards encompasses all common carriers by railroad," but that

"[l]ocomotives and rail cars used in industrial railroad operations that are conducted solely within an industrial complex would not be subject to these rules. *The FRA does not have the authority to limit the applicability of the EPA standards, and cannot except any operations that are common carrier operations subject to the Interstate Commerce Act.*"[7]

The interpretation given to section 210.3 of the FRA clearly reveals that no operations of Conrail subject to the Interstate Commerce Act were intended to be excluded from regulations of EPA. The switching operations of Conrail in the marshalling yards at Dover are common carrier operations subject to the Interstate Commerce Act. This substantiates the view of the Court that switching operations at the marshalling yards were intended to be covered by the noise emission regulations promulgated by the federal government.

---

**4.** Section 201.10(a) makes the regulations inapplicable to steam locomotives of a certain type, warning devices, etc., special purpose equipment located on or operated by rail cars and, subject to exception, interurban electric railways.

**5.** The relationship between the regulations of the Secretary of Transportation and those of the Administrator of the EPA is clear. The Secretary of Transportation is authorized to promulgate enforcement regulations only after consultation with the Administrator of the EPA, 42 U.S.C. § 4916(b) (Supp. IV 1975), and the enforcement regulations and the Noise Standard Regulation both became effective on the same date, October 1, 1977.

**6.** 42 Fed.Reg. 42,344 (1977).

Section 210.3 of the FRA regulations provides:

"(a) The provisions of this part apply to the total sound emitted by rail cars and locomotives operated by a common carrier as defined in 45 U.S.C. § 22 under conditions prescribed therein and in 40 C.F.R. Part 201, including the sound produced by refrigeration and air conditioning units which are an integral element of such equipment subject to stated exceptions which have no relevance."

**7.** 42 Fed.Reg. 42,344 (1977) (emphasis added).

The City places great reliance upon *Association of American Railroads v. Costle*, 183 U.S.App.D.C. 362, 562 F.2d 1310 (1977), arguing that it supports its view that the noise standards specified in sections 201.11, 201.12 and 201.13 are inapplicable to noises generated by locomotives and cars when engaged in marshalling and switching operations. A critical reading of the decision does not support this conclusion. The Court simply held that the EPA had erred in limiting its noise standards regulations to railroad cars and locomotives while the Noise Control Act made it obligatory for it to establish standards for *all* of the "equipment and facilities" of interstate rail carriers. The promulgated regulations, the Court observed, were limited to three sources, (1) locomotive operations under stationary conditions; (2) locomotive operations under moving conditions; and (3) rail car operations. The Court said, 183 U.S. App.D.C. at 367, 562 F.2d at 1315:

"No other types of railroad equipment and no railroad facilities *at all* are within the coverage of the promulgated standards. Specifically, the following 'equipment and facilities' are excluded from federal regulation: horns, bells, whistles and other warning devices; repair and maintenance shops, terminals, marshalling yards, and rail car retarders; special purpose equipment, such as cranes, derricks, and other types of maintenance-of-way equipment; and track and rights-of-way. . . .

. . . Indeed, in the context of this case, the EPA chose not to regulate any 'facilities' at all; this action in effect reads this word out of the statute."

The City would give the reference to marshalling yards an unwarranted interpretation. The Court apparently meant only that a marshalling yard was an unregulated "facility," not that noise was unregulated when caused by locomotives and cars in a marshalling yard.

This interpretation of the *Costle* case finds support in the discussion by the Acting Administrator of the EPA concerning the intended scope of the regulations (41 Fed.Reg. 2184–2194 (1976)). There the Administrator recognized that the noise emission standards of the regulation should not apply to "fixed facilities and area type sources" such as "yards and terminals" but should apply to noise generated by locomotives and cars within the areas of marshalling yards and terminals.

This is clear from the following, which appears at page 2186:

"b. *Repair and maintenance shops, terminals, marshalling yards, humping yards, and specifically, rail car retarders.*

.    .    .    .    .

The facilities and equipment found within railroad yard and terminal areas, *with the exception of locomotives, rail cars, and some mobile special purpose equipment*, are permanent installations which are normally subject to the environmental noise regulations of only one jurisdiction.

The Agency has determined that such fixed facility railroad yard and terminal noise is best controlled at this time at the local level, employing measures *which do not in themselves affect the movement of trains and therefore do not require national uniformity of treatment.*" (emphasis added).

Thus, the Administrator recognized that the regulations did not purport to cover noise emanating from "fixed facilities" in marshalling yards for the reason that these were best controlled at the local level. He made clear, however, that local jurisdiction over marshalling yards did not extend to "the local movement of trains" which "required national uniformity of treatment." In short, the control over the noise generated by locomotives (moving and stationary) and railway cars in marshalling yards was preempted by the federal regulation sections 201.11, 201.12 and 201.13 which prescribed generally and without limitation the noise standards for all locomotives and railroad cars.

█   Not only do sections 201.11, 201.12 and 201.13 apply to locomotives and rail cars but also to sound produced by refriger-

ation and air conditioning units—one of the subjects to which residents of Dover have complained.

■ The standards applicable to noises emitted by the parked refrigeration cars, like those caused by the movement of the locomotives and railway cars in the marshalling and switching yards outside of Dover, have been preempted by the federal regulations. As stated, since the ordinance is not "identical" with the federal regulations the ordinance cannot be enforced against Conrail by the terms of 42 U.S.C. § 4916(a)(1) (Supp. IV 1975).

■ A permanent injunction should issue enjoining the enforcement against Conrail of section 20–12 of the Dover Municipal Code.

### DOVER'S REMOVED STATE COURT ACTION

In its complaint Dover alleges that Conrail's use of the area along New Burton Road for the switching, storage, movement and marshalling of cars constitutes a public nuisance [8] in two respects: (1) by causing unnecessary and unusually loud noise and (2) by marshalling, storing and switching cars containing hazardous freight and toxic chemicals. The complaint requests the Court to abate the alleged nuisance by permanently enjoining Conrail from causing excessive, unnecessary or unusually loud noise and from using the area as a switching, marshalling or storage yard for railroad cars carrying hazardous materials or toxic chemicals.

*Noise*

■ As previously held, the Noise Control Act preempts Dover's noise ordinance and Dover may not enforce the ordinance against Conrail. What Dover may not do directly through enforcement of its ordinance, it may not do indirectly by means of a common law claim for nuisance.[9] It would be incongruous for the Court to hold otherwise. This conclusion is supported by the language of the preemption section of the Noise Control Act, 42 U.S.C. § 4916(c)(1) (Supp. II 1972), which provides that states and political subdivisions may not "adopt *or enforce any standard*" that is not identical with the federal standards (emphasis added). The amorphous standard relied upon by Dover—"unnecessary and unusually loud noise"—is not identical with that of the federal standards. Dover itself makes no contention in its post-trial brief (Doc. No. 27) that it is entitled to bring a common law nuisance action for noise if, as has been determined, the ordinance is preempted by federal law.

■ Even if there were no preemption, the Court, under the doctrine of primary jurisdiction, should decline to grant Dover's requested relief. The doctrine of primary jurisdiction was thoroughly discussed in *Kappelmann v. Delta Air Lines, Inc.*, 176 U.S.App.D.C. 163, 539 F.2d 165 (1976), cert. denied, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). *See also United States v. Western Pacific R.R.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). In *Kappelmann* an airline passenger sought injunctive relief against the defendant airline because of apprehended effects of the airline transporting radioactive material.[10] The

---

8. The complaint is framed in terms of "the comfort, repose, health, peace or safety" of the residents of Dover. For definitions of what constitutes a public nuisance, *see State ex rel. Bove v. Hill, et al.*, 39 Del.Ch. 511, 167 A.2d 738, 741 (1961) and 58 Am.Jur.2d *Nuisance* § 7 (1971).

9. Dover has made no claim of a nuisance under the federal common law; the Court need not consider whether the Noise Control Act preempts such a suit. *Cf. Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *Committee for the Consid-*

*eration of the Jones Falls Sewage Sys. v. Train*, 539 F.2d 1006 (4th Cir. 1976); *City of New Orleans, et al. v. United Gas P.L. Co., Bushey & Sons, Inc.*, 346 F.Supp. 145 (D.Vt.1972).

10. "[The] complaint requested
4) That this court grant temporary and permanent injunctive relief against defendant airline requiring it to give adequate warning of the presence of a significant amount of radioactive materials to (a) all prospective passengers who may be boarding airplanes operated as passenger flights by it and carrying a significant amount of radioactive mate-

action appears to have been based upon the common law equitable powers of the Court. The District Court dismissed the complaint and the Court of Appeals affirmed. This was upon the ground that primary jurisdiction existed under the Hazardous Materials Transportation Act where a regulation was in the process of being formulated relating to the subject of transportation of radioactive materials in passenger carrying aircraft.

In *Kappelmann* the Court at page 169 pointed out that the doctrine of primary jurisdiction traditionally has been applied in two distinct situations: (1) when uniformity of regulation is appropriate and (2) when there is a need for an initial consideration of the problem by a tribunal with specialized knowledge. In that case, as here, both reasons for applying the doctrine existed.

The need for uniformity of regulations is apparent from the intent of Congress in passing the Noise Control Act of 1972, as discussed previously. There is also present the need for consideration of the problem by a tribunal with specialized knowledge. As in *Kappelmann* in the case of transportation of hazardous materials, in the instant action the determination of whether a nuisance due to noise exists "requires the resolution of issues which, under a regulatory scheme, has been placed within the special competence of an administrative body," *Kappelmann, supra,* at 171, *quoting Western Pacific, supra,* 352 U.S. at 64, 77 S.Ct. 161. The injunctive relief against noise requested by Dover involves technical and policy questions which have industry-wide application. In order to grant the relief that Dover requests the Court would have to define "excessive, unnecessary or unusually loud noise" in terms of a quantitative measure, resulting in effect in a regulation having limited application to Conrail in the Dover area. "Such determinations are better made on an industry-wide basis in an agency rulemaking proceeding." *Id.* Congress has provided that forum for the Dover area through the Noise Control Act.

Relegating Dover to the rulemaking process as a means of achieving its relief is especially appropriate in this case, because the Administrator of the EPA is currently undergoing the rulemaking process. In *Association of American Railroads v. Costle,* 183 U.S.App.D.C. 362, 562 F.2d 1310 (1977), the Court of Appeals for the District of Columbia directed the Administrator to broaden the scope of the regulations to include equipment and facilities of interstate rail carriers, as well as locomotives and rail cars by August of 1978. Dover should attempt to participate in the rulemaking process before seeking injunctive relief from this Court against noise on the theory that Conrail is creating a public nuisance.

*Hazardous Freight and Toxic Chemicals*

■ An injunction against the "marshalling, storing and switching of cars containing hazardous freight and toxic chemicals" is inappropriate in light of the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 *et seq.* (Supp. IV 1974) and regulations promulgated thereunder.

Section 1801 of the Act declares it to be the "policy of Congress in this chapter to improve the regulatory and enforcement authority of the Secretary of Transportation to protect the Nation adequately against the risks of life and property which are inherent in the transportation of hazardous materials in commerce." Section 1803 provides that the Secretary shall designate as a hazardous material quantities and forms of materials that he finds to pose an unreasonable risk to health and safety or property when transported in commerce. Sections 1804 and 1805 authorize the Secretary to issue regulations for the safe transportation and handling of hazardous materials. Section 1809 provides for the imposition of penalties on those who knowingly violate the statute or regulations and sec-

rials; or in the alternative (b) all prospective passengers who may be boarding airplanes operated as passenger flights by it and carrying a significant amount of radioactive mate-

rials, which passengers have been exposed previously to a significant amount of radiation."
176 U.S.App.D.C. at 166, 539 F.2d at 168.

tion 1810 provides that the Attorney General may, at the request of the Secretary, bring an action for equitable relief against violators of the statutory provisions or the regulations. Section 1811(a) provides that, unless the Secretary upon application makes an exception under subsection (b), any "requirement" of a state or political subdivision inconsistent with the provisions of the Act or the regulations promulgated thereunder is preempted.[11]

The Secretary of Transportation has published an extensive list of materials that he has designated as hazardous materials in 49 C.F.R. § 172.101 (1976); regulations have been published in 49 C.F.R. §§ 172–176 and 179 (1976) governing the handling and transportation of these hazardous materials. These regulations concern the very subject that is the basis for Dover's claim.[12] Under section 1811(a), those regulations preempt any "requirement" of a state or political subdivision not excepted under subsection (b). It is not necessary to determine, however, whether Dover's present nuisance claim is a "requirement" that is preempted by the federal regulations, because it is clear that the doctrine of primary jurisdiction precludes Dover's claim. *See Kappelmann, supra*, at 170 n. 12.

■ The intent of Congress in passing the Hazardous Materials Transportation Act clearly was to provide a means for uniform regulation on the subject. *See*

*Kappelmann, supra*, at 169–70. A specialized tribunal—the Materials Transportation Bureau of the Department of Transportation—has been instituted to deal with the problem of hazardous materials. 49 C.F.R. § 102 (1976). While extensive regulations have already been promulgated, the rulemaking process continues.[13] Therefore it is appropriate for Dover to petition for a rulemaking proceeding under the Hazardous Materials Transportation Act before seeking injunctive relief in this court.[14] *See Kappelmann, supra*, at 169.

In its post-trial brief, Dover argues that,

"[r]ecognizing the preemptive effect of the Act and the Doctrine of Primary Jurisdiction, at this stage of the proceeding, this Court could certainly tailor its order for injunctive relief to prohibit Conrail from storing, switching, or marshalling railroad cars carrying hazardous or toxic materials not in compliance with the Federal Hazardous Materials Transportation Act in or around the residential development in question."

(Doc.No. 27, at 18). In essence, then, Dover requests the Court broadly to enjoin Conrail from violating the Hazardous Materials Transportation Act. Dover's complaint, however, alleges no violation of the Federal Act or any regulations promulgated thereunder. An injunction broadly prohibiting Conrail from violating the Act is therefore inappropriate.

11. The section provides, in pertinent part:

"(a) Except as provided in subsection (b) of this section, any requirement, of a State or political subdivision thereof, which is inconsistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is preempted.

(b) Any requirement, of a State or political subdivision thereof, which is not consistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is not preempted if, upon the application of an appropriate State agency, the Secretary determines, in accordance with procedures to be prescribed by regulation, that such requirement (1) affords an equal or greater level of protection to the public than is afforded by the requirements of this chapter or of regulations issued under this chapter and (2) does not unreasonably burden commerce. Such requirement shall not be preempted to the extent specified in such determination by

the Secretary for so long as such State or political subdivision thereof continues to administer and enforce effectively such requirement."

12. The particular chemical that was the subject of testimony at the hearing was anhydrous ammonia, *see* Record of Hearing, Doc. No. 25A, at 70–77, which is included in the Secretary's list of hazardous materials. 49 C.F.R. § 172.-101 (1976).

13. *See, e. g.,* the proposed rules published in 43 Fed.Reg. 983, 1369, 2741, 3598, 62397 and 64136 (1978).

14. 49 C.F.R. § 102.31 (1976) provides that any interested person may petition the Director of the Bureau to establish, amend or repeal a regulation and it sets forth the procedure for doing so.

The Complaint in the removed state court action will be dismissed.