**PUNNETT, Hope and Hinkie, Irene and Hinkie, Paul, a minor, by his parents, Howard E. and Irene Hinkie, and Hinkie, Howard E., Administrator of the Estate of Timothy Hinkie, deceased, on behalf of all others similarly situated.**

**v.**

**CARTER, Jimmy, President, Brown, Harold, Secretary of Defense, Schlesinger, James R., Secretary of Energy, Liverman, James, Dr., Deputy Assistant Secretary of Energy, Hendrie, Joseph M., Chairman, Nuclear Regulatory Commission, Jones, David O., General Chairman, Joint Chiefs of Staff, Califano, Joseph, Jr., Secretary, Department of Health, Education and Welfare, Alexander, Clifford L., Jr., Secretary of the Army, Lushbaugh, Clarence, Dr., Administrator, Medical Division, Oak Ridge Associated Universities, Marx, Sidney, Dr., Government Contract Officer, Seaborg, Glenn T., former Head, Atomic Energy Commission, and certain other past and present officers of the U.S. Department of Defense, Department of the Army, and the former Atomic Energy Commission, who will be named as defendants when ascertained individually, and in their official capacities.**

**Hope Punnett, Irene Hinkie, Paul Hinkie, and Howard E. and Irene Hinkie, Administrators of the Estate of Timothy Hinkie, Deceased, Appellants.**

No. 79–1497.

United States Court of Appeals, Third Circuit.

Argued Jan. 9. 1980.

Decided May 13, 1980.

Herbert B. Newberg (argued), Robert F. Gary, Donna Baker, Philadelphia, Pa., for appellants.

John F. Cordes (argued), Robert E. Kopp, Attys., App. Staff, Civ. Div., Dept. of Jus-

tice, Alice Daniel, Acting Asst. Atty. Gen., Peter F. Vaira, Jr., U. S. Atty., Washington, D. C., for appellees.

Before GIBBONS, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The legal fallout in this action stems from a nuclear mushroom cloud formed high over the Nevada desert about twenty years ago. In this appeal we are presented with a claim for preliminary injunctive relief for alleged mutagenic dangers arising out of the open-air testing of nuclear weapons in the Nevada desert in the 1950's and early 1960's and for damages. The district court denied the requested relief. We affirm.

## I. PROCEDURAL HISTORY

On January 4, 1979, the plaintiffs filed a class action complaint[1] in the United States District Court in the Eastern District of Pennsylvania against President Carter and other government officials of the United States, alleging that the defendants had withheld information of the deleterious health effects of the Nevada nuclear bomb tests upon United States Army servicemen who had participated in the tests. An amended complaint sought preliminary injunctive relief enjoining the defendants from withholding public dissemination of all documents or studies now available to the United States Government relating to the long range health effects from radiation exposure to all participants in the Nevada testing from 1951 to the present date.[2] Relief was also sought requiring the United States to issue public warnings of the higher risks of mutagenic defects that may result in offspring born to such participants. The complaint sought a permanent injunction enjoining the defendants from causing anyone to participate in peace time testing of nuclear military devices without first informing them of the high risks to their health and safety, of the possible mutagenic dangers to their offspring, and without having obtained full voluntary consent. Finally, the complaint sought exemplary and compensatory damages, attorneys' fees, and costs.

At the hearing on their motion for a preliminary injunction for the requested warning,[3] plaintiffs presented testimony by both lay and expert witnesses. At the conclusion of the plaintiffs' presentation of evidence, the Government moved for a denial of the preliminary injunction and for a dismissal of the case. The district court grant-

---

1. Plaintiffs moved for class certification for three classes: (1) genetic counselors, physicians, and their patients; (2) wives and mates of servicemen stationed at the Nevada site during the nuclear tests; and (3) all offspring of service personnel who had at least one parent stationed at the Nevada site during the testing. The district court has not yet ruled on the plaintiffs' motion.

2. Although the district court denied the application for a preliminary injunction requiring the United States to give public warnings, the court apparently did not separately rule on the application enjoining the defendants from withholding public dissemination of relevant documents and studies. The plaintiffs have not raised this issue on appeal.

3. Dr. Victor W. Sidel, one of the plaintiffs' expert witnesses, suggested in his affidavit that the warning should be formulated along the following lines:

   You may have an increased risk of having children with birth defects because of your participation at atom bomb tests at the Nevada test site while you were in the service. If you decide to have children you may wish to seek genetic counseling or other medical advice before your children are conceived and while they are developing inside their mothers and even after they are born. The purpose of this extra precaution for your family would be to minimize the risk of your child being born with unexpected birth defects and to determine the risk of such defects under all the medical and family circumstances of your particular experience and situations. The warning sought here is thus different from that at issue in *Jaffee v. United States*, 592 F.2d 712 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). The warning in *Jaffee* dealt with somatic or body injuries to the servicemen such as cancer and leukemia, not with genetic injuries to the servicemen and their families as are alleged here.

ed the motion to deny the preliminary injunction but rejected the motion to dismiss the action. The plaintiffs appeal.

## II. FACTUAL BACKGROUND

The plaintiffs' argument in support of their motion for a preliminary injunction may be summarized as follows. First, the servicemen present at the Nevada tests were exposed to a level of radiation substantially in excess of that suffered by the general population. Second, as a result of such exposure, the servicemen have a significantly higher risk of radiation-induced damage to their genetic structure. These genetic defects may be passed on to their offspring, producing birth defects or other undesirable consequences. The plaintiffs claim affected servicemen are entitled to a warning to allow them and their families to make informed family planning decisions and to take such other health precautionary measures as may be necessary.

Plaintiffs' lay witnesses consisted of six Army servicemen who testified they had participated in the Nevada tests during the period 1954–1955 and had been present at the detonations.[4] These witnesses testified that they had performed various functions at the tests and were positioned at various distances from the actual detonation site. The number of atomic tests which each of them attended varied widely from one to eighteen. They testified that they and their fellow participants had experienced nose bleeds, nausea, and vomiting during and after the detonations. Testimony as to the frequency of such occurrences, however, varied widely. Some indicated such symptoms were common, others stated they were infrequent, and one witness said that he personally had experienced none. Only one indicated that he had subsequently suffered from a serious physical disorder, an incurable muscle disease. No evidence, however,

was offered to link that disorder with the radiation exposure. One of the witnesses, Howard Hinkie, is a named plaintiff in this action. He testified that since the tests he has fathered two children who suffered from birth defects, one of whom has died. Although testimony was introduced which indicated the problems of this child and another of the Hinkie children are consistent with those that might result from a parent's exposure to radiation, there was no evidence showing the presence of such a causal connection. Each of the witnesses testified that neither he nor his family has ever been notified of the possible mutagenic dangers posed by his exposure to the radiation.

The plaintiffs also presented testimony by four experts: Dr. Ernest Sternglass, Dr. Rosalie Bertell, Dr. Hope Punnett, and Dr. Victor W. Sidel. Dr. Sternglass testified to the amount of radiation sustained by the servicemen who participated in the Nevada tests and he calculated their average dosage. Dr. Bertell presented computations on the effects of radiation and the mutagenic effects of radiation. Dr. Punnett testified to the genetic effect of radiation exposure and to the diagnosis and treatment of genetic defects. Dr. Sidel testified to the possible mutagenic dangers of radiation exposure.

The court denied the preliminary injunction, holding that the plaintiffs had failed to demonstrate a likelihood of success on the merits and that they had made no showing of irreparable harm. The court's holding rested substantially upon its conclusion that the plaintiffs had failed to show by persuasive scientific evidence that the risk of mutagenic defects in the offspring of exposed servicemen and their descendants is substantially greater than the risk to many segments of the civilian population or even to the population as a whole.[5]

---

4. From the record, however, it appears that one of those servicemen, William Hodsden, was incarcerated at Fort Lee, Virginia, during the period when he said he participated in the atomic tests. The district court accordingly discounted his testimony.

5. The court also found that the plaintiffs had failed to show that (1) test participants who have suffered impairment of their reproductive processes would not already be aware of such impairment regardless of its cause, and (2) that anyone would be substantially benefitted by the warning.

The court also found a strong likelihood that the granting of the preliminary injunction would result in substantial harm to others. Judge Ditter found that "[t]he effect of a warning from the United States Government that the recipient has been exposed to radiation which may cause mutagenic defects in his children could be thoroughly devastating." He also found that plaintiffs' experts also recognized that there are many social, moral, and political issues to be considered in the dissemination of the warning plaintiffs sought. Judge Ditter also found that "[t]he public interest does not favor the dissemination of this warning, at least not until there has been much greater exploration of its potential effects than what may be involved in it." The court concluded that "[i]n light of the unconvincing nature of plaintiffs' scientific evidence, their failure to show that they will be irreparably harmed, without the probability that other interested parties may be injured, . . . the plaintiffs have not shown any likelihood that they will prevail on the merits of this suit."

### III.  LEGAL STANDARD

It is appropriate first to note that the final disposition of the merits of this lawsuit is not at issue in this appeal. We are not called on to decide at this stage whether the Government's nuclear testing activities between 1951 and 1962 in the Nevada desert were harmful to the participants or whether the Government's conduct was negligent, malicious, or reckless. Rather, we are asked solely to review the district court's denial of the plaintiffs' motion for a preliminary injunction compelling the Government to give warning to the test participants of the possible mutagenic effects of their allegedly excessive exposure to radiation. Moreover, the preliminary injunction sought here would not merely have preserved the status quo *pendente lite* but would have effectively granted plaintiffs substantial portions of the ultimate relief sought in this lawsuit.

In reviewing the grant or denial of a preliminary injunction, the scope of our review is limited and the burden on the party seeking reversal is high. *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1970). The scope of our review is limited to

> determining whether there has been an abuse of discretion, an error of law or a clear mistake in the consideration of the proof.

*Commonwealth of Pennsylvania ex rel. Creamer v. Department of Agriculture*, 469 F.2d 1387, 1388 (3d Cir. 1972).

The moving party on a motion for a preliminary injunction must generally show (1) a reasonable probability of ultimate success on the merits of the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. *Delaware River Port Authority v. Transamerican Trailer Transportation, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974). In addition, the district court "should take into account, when they are relevant (3) the possibility of harm to other interested persons from the grant or denial of the injunction and (4) the public interest." *Id.* at 920. See *Oburn v. Shapp, supra*, 521 F.2d at 147. The determination of whether an injunction should issue depends on a balancing of these several factors. Furthermore, when the preliminary injunction is directed not merely at preserving the status quo but, as in this case, at providing mandatory relief, the burden on the moving party is particularly heavy. *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir. 1976). In the case before us we find neither a clear mistake in the consideration of the proof nor any error of law in the standards to be applied.[6] Accordingly, we must turn to the relevant factors to determine whether there has been an abuse of discretion.

### IV.  REASONABLE PROBABILITY OF SUCCESS

As we noted in *Oburn v. Shapp, supra*, 521 F.2d at 148:

---

**6.** Plaintiffs assert that the district court erred in excluding certain documents and testimonial evidence. We see no merit to this contention.

It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits.

In the case before us, we are presented not merely with a motion for an injunction to preserve the status quo *pendente lite* but with a request for a mandatory injunction that would have the effect of granting a substantial portion of the relief sought in the plaintiffs' complaint. Thus, although it can be argued that plaintiffs should be held to a higher standard, they must at least make out a prima facie case. The district court held that the plaintiffs had failed to show any likelihood that they would prevail on the merits of this suit. That conclusion was based substantially on the court's finding of the "unconvincing nature of plaintiffs' scientific evidence."

Central to the plaintiffs' case is their contention that servicemen involved in the Nevada tests were exposed to radiation levels sufficient to cause an increased risk of mutagenic defects in their offspring and in the issue of their offspring. Plaintiffs argue that the dosimetry calculations that were the basis of their experts' testimony were performed by both Dr. Sternglass and Dr. Sidel. They assert that Dr. Sternglass relied on "purely physical measurements and the inferences to be drawn therefrom,"

and Dr. Sidel "in part used a method of physiological signs." It is undisputed that Dr. Sidel testified to the physiological symptoms which are evidenced by those exposed to significant amounts of radiation. The servicemen present at the tests did testify that they and others had experienced such symptoms. From the record, however, it is not clear that all, or even most, of the servicemen experienced such symptoms. Nor did Dr. Sidel testify that, from the limited evidence of such symptoms before the court, one could infer that large numbers of those present at the tests had been exposed to significant amounts of radiation. Rather, Dr. Sidel testified that he was relying upon the calculations performed by Dr. Sternglass. *See* note 7 *infra*. Moreover, Dr. Sidel testified that his expertise is not in radiation dosimetry but in social policy and medical care issues related to radiation and its effects.

Among the experts relied upon by the plaintiffs, only Dr. Sternglass is an expert in radiation dosimetry. In addition, plaintiffs' other experts relied upon Dr. Sternglass' calculations in their determination of the probable biological effects of the radiation exposure.[7] Dr. Sternglass' calculations are therefore crucial to the plaintiffs' case.

Dr. Sternglass testified that the "average dose for the average man" present at the detonations was approximately 300 rems.[8]

7. Dr. Sternglass stated in his affidavit that he had calculated the average radiation dose received by servicemen present at the Nevada tests as being approximately 300 rems. A rem is a unit of biological dose of radiation. In her affidavit, Dr. Bertell assumed that the average participant in the Nevada tests had received a 320 rem dose, apparently relying on Dr. Sternglass' calculations. Drs. Punnett and Sidel made the same assumptions of dosage level in their affidavits. In addition, Dr. Sidel specifically testified that he had not calculated the dosage level himself but had relied upon calculations performed by Dr. Sternglass.

8. The district court found that Dr. Sternglass' calculations were based upon the following assumptions:
(1) The average trench in which men were stationed was located two miles away from ground zero (site of detonation).

(2) Seventy per cent of the bombs were assumed to contain plutonium and 30 per cent were presumed to contain uranium.
(3) The average yield of the bombs was 20 kilotons.
(4) The total number of individuals exposed between 1951 and 1962 is 100,000.
(5) The total number of men stationed in trenches in standing or sitting position was 60,000 at a distance of about 3,000 [yards] or two miles at the time of the detonation. One to six hours after the detonation the men were as close as zero yards from ground zero.
(6) There were 10,000 permanent staff people assigned to distances at one time or another ranging from 0 to 5,000 yards away from ground zero. Zero yards obviously does not refer to the time of the detonation.
(7) Thirty thousand men were involved in non-trench and maneuvering close to ground

The district court, however, concluded that "[t]he calculations of Dr. Sternglass as to the average dose received by the test participants cannot be accepted because several of the essential assumptions upon which he relied were shown to lack any factual basis." First, Dr. Sternglass had assumed the average yield of the bombs tested was 20 kilotons.[9] On cross-examination, however, he calculated that, on the basis of more recent information, the average yield had been only 11.55 kilotons. Second, Dr. Sternglass made an error in his calculation of the gamma dose, a part of which consists of a neutron dose. Because of a mistake in reading the appropriate scale as to the neutron dose, his original calculation of 4.9 rems[10] per shot of gamma dose had to be corrected to 1.3 rems per shot. Dr. Sternglass had assumed that each man had attended three shots. His original calculation for an average gamma dose per shot was multiplied by three for a total of 14.7 rems, which he had rounded off to 15. The correct total should have been 3.9 rems of total gamma dose.

Dr. Sternglass also relied on an algebraic formulation in calculating the level of radiation to which the servicemen were exposed. The formula is set forth in a book published by the United States Government entitled *The Effects of Nuclear Weapons* (1977). That book, however, points out that the formula is inaccurate while fallout particles from the explosion are still in descent and indicates that as little as 30 minutes after the detonation, the formula will only be accurate to within 25 percent.

Dr. Sternglass also compared the actual marching orders for the detonation designated "Apple II" with isorad plots, *i. e.*, graphs indicating levels of radioactivity at various distances from the detonation site. He found that the servicemen traveled through a zone which he found to have an exposure rate of 53 rads[11] per hour and that they remained in that zone for 18 minutes. Thus, Dr. Sternglass concluded that the men received a dosage of 15.9 rads. On cross-examination, however, it was shown by reference to official government reports that the tanks were to veer from ground zero upon reaching a zone with an intensity of 8 rads. The district court concluded that "[f]rom this it became evident that in calculating the dose during the 18 minutes, Dr. Sternglass should have used a rate of 8 rads per hour, rather than 53 rads per hour."[12]

The court found that Dr. Sternglass' calculation of the amount of radiation received due to the inhalation of plutonium and other radioactive particles was also suspect. Dr. Sternglass had concluded that the average serviceman had received a dose of 1760 rems by inhalation, the effects of which would be absorbed by the body over a period of 50 years or more. This calculation depended upon the use of figures on airborne radiation obtained in St. George, Utah, 30 miles from the test site. Those figures were the highest ever recorded there. Thus, the estimated level for the test site likewise would have been the highest ever recorded there. The recorded levels for air concentration in Mercury, Neva-

---

zero at an average distance of 5,000 to 15,000 yards from ground zero, and not closer distances after shot time.
(8) The average time spent at the test site by each man was 20 days.
(9) The average man attended three shots.
(10) The initial gamma dose from the shot [*i. e.*, the detonation] came in the first two seconds, and assuming a 20 kiloton shot was 50 to 60 rads at one mile, at two miles it was a 0.1 rad dose, and at three miles the rad dose would have been 0.002.
One kiloton is defined as an explosive force equivalent to that of 1,000 tons of TNT. A rad is a unit of absorbed dose of radiation. The number of rems of radiation is equal to the

number of rads absorbed multiplied by the Relative Biological Effect of the given radiation.

**9.** For a definition of "kiloton," *see* note 8, *supra*.

**10.** For a definition of "rem," *see* note 7, *supra*.

**11.** For a definition of "rad," *see* note 7, *supra*.

**12.** The court also noted that the final report of the Desert Rock detonations stated that vehicles were prohibited from crossing the 5 rad per hour line "causing further doubt on the assumption that the tanks spend 18 minutes in a 53 rad per hour zone."

da, which is only a few miles from the test site, were 100,000 times lower than at St. George. Although Dr. Sternglass reduced the air concentration values from St. George by a factor of 10, the district court found that they were still subject to challenge by a figure of 10,000.

For the purposes of his calculations, Dr. Sternglass also assumed that each man attended three detonations of 20 kilotons each over a 20-day period. The district court, however, observed that "the record shows there were many times when there were not three shots of anything like the magnitude of 20 kilotons during a 20-day period."

On the basis of the foregoing analysis, the district court thus concluded:

Plaintiffs' evidence and the methodology used by Dr. Sternglass do not support any of the basic assumptions which he stated, and those assumptions were relied upon by him and by the other witnesses who were called to testify as experts.

The plaintiffs apparently do not dispute the district court's finding that many of the assumptions relied upon by Dr. Sternglass are open to question. Rather, they contend that those mistaken assumptions are largely irrelevant to their case.[13] The plaintiffs assert that Dr. Sternglass used "four entirely separate approaches" in making his calculations. One of those approaches, they argue, was an idealized hypothetical model and they assert that it is this model which rested on the assumptions questioned by the district court. They further argue that the other three approaches are independent and therefore not impaired by the possible weaknesses of assumptions. As characterized by the plaintiffs, these other approaches involved "measured plutonium ratios, measured isorad plottings, actual marching orders and measured readings of airborne radioactive particles." They con-

tend that "[t]he court ignored the evidence presented about plutonium concentrations and plutonium toxicity and ignored all the testimony about inhaled radioactive aerosols, and disregarded the careful analysis of the specific shots based on the marching orders and the isorad lines."

The plaintiffs' contentions are without merit. As can be seen from the above discussion, the court did consider the testimony regarding radioactive aerosols. The court, however, concluded that the testimony was not credible because it was based on air concentration levels which were the highest ever recorded at a location relatively distant from the test site. Further, the court did not disregard the testimony of specific shots but concluded, at least as to Apple II, that it was based on inaccurate assumptions.

Indeed, Dr. Sternglass himself conceded on cross-examination that these assumptions could be expected to have at least some effect upon his calculations. For instance, he testified that his error as to the radiation levels to which the tanks were exposed may have affected his calculation by 20 to 30 percent of the dose the servicemen sustained. Further, he acknowledged that, in light of the later and more precise information furnished by the Government, his calculation of the open field gamma dose for men entering the fallout field was "in the ball park and that is all it was ever intended to be." In addition, although Dr. Sternglass assumed that substantial numbers of soldiers spent large periods of time in zones where the radiation level was 100 rads per hour, he testified he had no personal knowledge of that fact but was relying on a representation by plaintiffs' counsel who had arrived at that conclusion based on his "best judgment and belief." The doctor also testified that the radiation dose experi-

13. The plaintiffs also asserted, in oral argument before this court, that "the record will show that the testimony of the other experts was quite independent and different from the testimony of Dr. Sternglass." In their reply brief, however, the plaintiffs appeared to concede that their other experts had relied upon Dr. Sternglass' calculations. There they stated

"the dosimetry calculations that were the basis upon which plaintiffs' other experts calculated the probable biological effects, were done by two witnesses, Dr. Sternglass and Dr. Sidel." Regardless of the plaintiffs' position, however, it is nevertheless clear from the record that the plaintiffs' other experts did in fact rely upon Dr. Sternglass' calculations. See note 7 supra.

enced through inhalation would depend upon the distance from the trenches to the detonation, upon the average time spent at the test site, and upon the average number of tests attended. He also indicated that his figure of 1,760 rems per man was an "absolute upper limit" for exposure levels. Thus, actual exposure levels could have been much lower. The lower limit he testified might be one-tenth the amount.

Given the questionable nature of many of the assumptions relied upon by Dr. Sternglass and the resulting imprecision of his calculations, the level of radiation to which the servicemen were exposed is extremely uncertain. Accordingly, in light of the pivotal importance of the radiation dosage level to the plaintiffs' case, we cannot say that the district court abused its discretion in concluding that plaintiffs had failed to show a reasonable likelihood of prevailing on the merits.[14]

## V. IRREPARABLE HARM

■ The moving party on a motion for a preliminary injunction bears the burden of demonstrating an imminent threat of irreparable harm. *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351 at 356–57, 359 (3d Cir. 1980). The trial judge concluded that the plaintiffs had made no showing of irreparable harm. His oral opinion rested substantially upon the conclusion that the plaintiffs "have failed to show by persuasive scientific evidence that the risk of mutagenic defects in the offspring of the suggested plaintiff class is substantially greater than the risk to many segments of the population or even to the population as a whole." For the reasons discussed below, we agree with the district court that the plaintiffs have not carried that burden.

The plaintiffs argue that there is no level of radiation at which the risk of mutations will not be increased. Dr. Bertell, for in-

stance, testified that some genetic effects have been shown to occur at an exposure level of 0.8 rads. Thus, the plaintiffs apparently argue that, even though it may not be precisely clear to what level of radiation the servicemen were exposed, it is highly probable that they were exposed to some radiation level in excess of the level of exposure of the general population. Accordingly, they assert that the servicemen have a higher risk of mutagenic defects from that radiation exposure and must be warned.

Even assuming, however, that such a higher risk of mutagenic defects has been shown, the level of that risk has not been established. First, the amount of radiation to which the servicemen were exposed has not been established with any certainty. As previously discussed, the calculations of Dr. Sternglass rest upon several mistaken assumptions. Second, the evidence introduced of the mutagenic nature of radiation is also uncertain. Dr. Bertell's statistical calculations of the likely mutagenic effect of exposure to the radiation level depend upon the calculations made by Dr. Sternglass. However, Dr. Bertell repudiated her methodology, characterizing it as "Mickey Mouse." It may well be as plaintiffs urge, that Dr. Bertell's repudiation of the statistical methodology rested upon her belief that any amount of exposure to ionizing radiation increases the risk of genetic damage. Nevertheless, such statistical methodology is highly relevant to a court in determining whether to provide equitable relief, for it allows a court to estimate the degree of risk. Dr. Bertell's repudiation of her own calculations raises significant questions about the degree of risk to which the members of the suggested plaintiff class are subject. Nor does Dr. Punnett's testimony add measurably to the weight of that evidence. She is not a statistician, and, although she adopted Dr. Bertell's calculations of the possible genetic effect, she was

14. The Government argues, in addition, that the plaintiffs have failed to advance a legal theory which would justify granting the requested relief. The district court, however, denied the Government's motion to dismiss and the Government has not appealed. Accordingly, this issue is not properly before us and we express no opinion as to the merits of the Government's contention.

not able to independently reproduce these calculations on the witness stand. Further, Dr. Punnett was unable to testify that radiation had caused the birth defects of Hinkie's children, although Hinkie had been present at the nuclear tests.

The district court concluded that the plaintiffs had not shown that the risk of mutagenic defects in the plaintiff class was substantially greater to them than to the population as a whole. Viewed against the background we have described above, we cannot say that the plaintiffs have made a convincing showing that the suggested class will be irreparably harmed if injunctive relief is not immediately granted. On the other hand, the hazards of potential harm that might flow from an injunction awarding the relief sought lend weight to the district court's decision to deny the preliminary injunction.

## VI. THE PUBLIC INTEREST AND POSSIBILITY OF HARM TO OTHER INTERESTED PARTIES

■ Particularly in cases such as this, involving important public issues which implicate significant policy considerations, it is appropriate that the trial judge consider possible harm to other interested parties and the public interest in deciding whether to issue the preliminary injunction. *See Oburn v. Shapp, supra*, 521 F.2d at 142, 151–52. In the case before us, the district court found that there was a strong likelihood of harm to other parties if the requested relief were granted, and that issuance of the injunction would be contrary to the public interest. Distressed by these possibilities, the court stated:

> The effect of a warning from the United States Government that the recipient has been exposed to radiation which may cause mutagenic defects in his children

could be thoroughly devastating. Obviously, the resulting anxiety would be immeasurable. Plaintiffs have not shown what impact such anxiety could itself have on an existing pregnancy. However, a risk of unnecessary abortion is present. [Test] participants may be unreasonably rejected as marital partners. Families that have long existed may be broken up. Recrimination and doubt may follow. Couples may make unnecessary family planning decisions which they would not have otherwise made.

The plaintiffs contend, however, that all of their expert witnesses testified to the need for the requested warning and its beneficial effect. They assert that there "is absolutely no support in the record for the court's conclusions." The testimony by Dr. Sidel, one of the plaintiffs' witnesses, provides more than ample support for the court's conclusion. Dr. Sidel's expertise is in the area of social policy related to medical hazards and medical care. Thus, he is uniquely qualified to testify to the sorts of considerations involved in determining whether the requested warning should be issued. Dr. Sidel acknowledged that there were public policy questions to be considered in issuing the requested warning to individuals other than the servicemen themselves, *e. g.*, to their children and wives.[15] Specifically, Dr. Sidel agreed that, among the possible effects of the requested warning were: anxiety, a desire for additional testing, additional abortions and sterilizations,[16] rejection of some persons as marital partners, and an increase in the use of artificial insemination.

■ As we have already noted, when the preliminary injunction provides for mandatory relief, it is particularly appropriate to weigh the possible harm to other interested parties. The injudicious issuance of an in-

---

15. Dr. Sidel was apparently under the impression that the initial warning would go only to the servicemen themselves. The plaintiffs, however, sought a preliminary injunction requiring that the Government send an individual notice to the servicemen and their families and give notice by publication and public service announcement on radio and television.

16. Dr. Sidel disputed whether such abortions and sterilizations could be termed "unnecessary." However, he apparently agreed that abortions and sterilizations might result from the issuance of the warning.

junction might well result in unnecessary damage to other parties, perhaps as irreparable and more grave than the harm that might ensue from the denial of the injunction. Given the testimony of Dr. Sidel, we cannot say that the district court erred in its assessment of the possible deleterious effects that might result from the issuance of the warning.

## VII.

■ On a motion for a preliminary injunction, plaintiffs are not required to prove their case with airtight certainty. Few things in this world are certain and we should not erect insurmountable barriers to judicial relief by holding plaintiffs to an impossibly high standard. Nevertheless, as we have already mentioned, the moving party bears a heavy burden on a motion for a preliminary injunction, particularly one seeking mandatory relief. On the basis of the record before us we do not believe that the plaintiffs have carried that burden. The risk of mutagenic defects in the suggested plaintiff class are uncertain and outweighed by the possible harms to other parties which might be caused if the injunction were to issue improvidently. We cannot say that the district court abused its discretion in declining to issue the preliminary injunction.

Accordingly, the judgment of the district court will be affirmed and the case remanded for further proceedings not inconsistent with this opinion. Each side to bear its own costs.

---

*George Dudley, Jr., Esquire was relieved as counsel on December 17, 1979 after filing a brief pursuant to *Anders v. California*, 368 U.S.