The **BALTIMORE AND OHIO RAIL-ROAD COMPANY, a corporation of the State of Maryland, d/b/a One of the Chessie Systems Railroads, the Baltimore and Philadelphia Railroad Company, a corporation of the States of Pennsylvania and Delaware, d/b/a One of the Chessie Systems Railroads, Mount Clare Properties (Delaware), Inc., a corporation of the State of Maryland, and Chessie Motor Express, Inc., a corporation of the State of Delaware, Plaintiffs,**

v.

**Charles M. OBERLY, III, Attorney General of the State of Delaware, and John E. Wilson, III, Secretary of the Department of Natural Resources and Environmental Control of the State of Delaware, Defendants.**

Civ. A. No. 84–452–WKS.

United States District Court,
D. Delaware.

April 9, 1985.

David S. Swayze, William E. Manning, James L. Holzman, Wendie E. Cohen, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., Richard Keene, John J. Higinbothom, Baltimore, Md., for plaintiffs.

John J. Polk, Ellen R. Chaikin, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

STAPLETON, Chief Judge:

The plaintiffs in this case, Baltimore & Ohio Railroad Company ("B & O"), the Baltimore & Philadelphia Railroad Company, Mount Clare Properties (Delaware), Inc. and Chessie Motor Express (collectively "the Chessie Group"), bring this action for declaratory and injunctive relief against defendants Charles M. Oberly, III, in his capacity as the Attorney General of the State of Delaware, and John E. Wilson, III, in his capacity as the Secretary of the Department of Natural Resources and Environmental Control ("DNREC"). Plaintiffs seek to restrain the defendants from the threatened application and enforcement of the Delaware Noise Control Act, 7 Del.C., Chapter 71 (the "Delaware Act") and regulations thereunder on the grounds that the Delaware regulatory scheme is unconstitutional.

On August 14, 1984, defendant Wilson advised B & O's attorneys that the Delaware Department of Justice was preparing an action seeking injunctive relief at the Wilsmere Intermodal Facility (the "Wilsmere Facility" or "the Facility") for alleged violation of the Delaware Act. In response, the plaintiffs filed this action on August 17, 1984, and immediately thereafter moved for a temporary restraining order. A hearing on that motion was held on August 20, 1984, and the motion was granted.

The case is currently before the Court on plaintiffs' motion for a preliminary injunction. The plaintiffs' request for preliminary injunctive relief will be granted.

## I. FACTS

The Facility is a railroad terminal located in New Castle County, Delaware. Plaintiffs B & O and its subsidiary B & P conduct joint railroad operations at the Facility. The property is co-owned by B & P and Mount Clare Properties.

Over the past three decades, technological changes in the railroad industry have led to an increase in "intermodal" operations, which reflect a "marriage" between the railroad and trucking industries. Intermodal transportation is accomplished through the use of trailers or containers on flat cars which may be hauled by truck or rail ("TOFC" and "COFC" respectively). The Wilsmere Facility commenced intermodal operations in October 1982.

Perishable goods and produce from southern growing regions, destined for northeastern market distribution, constitute a great portion of the traffic at the Facility. These goods are transported by refrigerated trailer units which employ continuous action generators or compressors to maintain a constant temperature and prevent spoilage. These trailers perform the functions formerly performed exclusively by railroad refrigerated box cars.

At an August 1, 1984 meeting convened to discuss noise emissions from the Wilsmere Facility, representatives of the Air Quality Section of DNREC advised plain-

tiffs' attorneys that the equipment over which there was most regulatory concern was the refrigerated trailers. A representative of DNREC further advised plaintiffs' attorney, Mr. Manning, that a noise attenuation level of 29 decibels was necessary to comply with the Delaware regulations.

The plaintiffs in turn consulted an expert concerning the feasibility of complying with the 29 decibel attenuation requirement advised by DNREC. Based on their expert's analysis, plaintiffs concluded that they would be forced to discontinue or dramatically reduce intermodal operations at the Wilsmere Facility if forced to comply with the 29 decibel noise reduction requirement.

## II.

The test for determining whether a preliminary injunction should issue was set forth by the Third Circuit in *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir.1980):

The moving party on a motion for a preliminary injunction must generally show (1) a reasonable probability of ultimate success on the merits of the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. In addition, the district court 'should take into account, when they are relevant (3) the possibility of harm to other interested persons from the grant or denial of the injunction and (4) the public interest.' [citations omitted].

The first inquiry, therefore, is whether the plaintiffs have shown a reasonable probability of success on the merits of their request for injunctive relief after a full hearing.

### A. *Success On The Merits*

The plaintiffs argue that the Delaware Act is invalid and unenforceable on three grounds: (1) the Delaware Act is preempted by the Federal Noise Control Act of 1972 and regulations promulgated thereunder; (2) enforcement of the Delaware Act would impermissibly burden plaintiffs' op-

erations in interstate commerce in violation of the Commerce Clause; and (3) both the Delaware Act and its regulations are void for vagueness under the Fourteenth Amendment.

Since I find that the plaintiffs have demonstrated a reasonable probability of ultimate success on the merits of their preemption argument, I need not consider the arguments based on the Commerce Clause and the Fourteenth Amendment.

Based on the language and legislative history of the Noise Control Act of 1972, 42 U.S.C. § 4901, the defendants concede that Congress generally intended to preempt the regulation of noise created by interstate railroads. Defendants contend, however, that the federal government, by choosing not to prescribe noise standards for certain activities at railroad facilities, has left a "regulatory gap" that leaves those activities free of federal regulation and subject to state control.

With a few minor exceptions, the federal railroad noise standards apply to all rail cars and all locomotives. 40 C.F.R. § 201.-10. The standards purport to apply particularly to all active retarders, all car coupling operations, all switcher locomotives, all load cell test stands, and

... the total sound level emitted by rail cars and locomotives operated under the conditions specified, including the sound produced by refrigeration and air conditioning units which are an integral element of such equipment.

*Id.* The regulations set out sound level standards for applicable activities.

The defendants point out that, notwithstanding their stated applicability to refrigerator units on rail cars, the regulations prpound no standard for these units. The defendants maintain that the federal government's failure to promulgate standards for these units leaves the operation of noise emitting, motionless refrigerated trailers and containers free of federal control.[1]

---

**1.** The pertinent regulations speak of rail cars

equipped with refrigeration units. 40 C.F.R.

To more fully understand the defendants' argument respecting the so-called "regulatory gap," it is necessary to briefly review the history of the pertinent regulations promulgated pursuant to the Act. This review necessarily entails consideration of *Association of American Railroads v. Costle,* 562 F.2d 1310 (D.C.Cir. 1977).

In *Costle,* the plaintiff, Association of American Railroads, challenged the validity of the action of the Administrator of the EPA in promulgating under the Act railroad noise emission standards limited solely to rail cars and locomotives. Section 17 of the Act required the Administrator to establish emission standards for noise "resulting from operation of the equipment and facilities" of interstate rail carriers. 42 U.S.C. § 4916(a)(1). The plaintiff in *Costle* argued that Section 17 required the Administrator to promulgate regulations for *all* of the "equipment and facilities" of interstate rail carriers. The EPA on the other hand argued that the Act vested the Administrator with discretion to determine which sources of railroad noise were to be regulated at the federal level. *Id.* at 1311.

The Court of Appeals for the District of Columbia concluded that the EPA had misinterpreted the scope of the mandate of Section 17 of the Act through its "artificial and narrow" definition of "equipment and facilities." *Id.* at 1321. Indeed, the EPA had regulated only locomotives and rail cars, and had not regulated "facilities" at all. *Id.* at 1320. *Costle* concluded that the plain language of Section 17 of the Act did not permit the interpretation that Congress intended to vest discretion in the EPA to decide *which of the* equipment and facilities would be subject to regulation. *Id.* at 1315 (emphasis supplied by court). The court found that the reference to "equipment and facilities" was unambiguous and "subsumes *all* such equipment and facilities." *Id.*

The court in *Costle* did not, however, provide a definition for the phrase "equipment and facilities," but instead ordered the EPA to promulgate regulations in accordance with the meaning of "equipment and facilities" as that phrase is customarily used in the railroad industry. *Id.* at 1321.

On April 17, 1979, the EPA proposed regulations in response to the court's order in *Costle.* 44 Fed.Reg. 22960 (1979). In these proposed rules, the EPA suggested a specific standard limiting noise emissions for refrigerator cars. In addition, the EPA proposed property line standards to comply with *Costle*'s order requiring the regulation of noise emanating from railroad "facilities." In so doing, the EPA identified the significant noise sources that comprise the overall noise resulting from rail facilities. Among the noise sources identified were TOFC/COFC operations. 44 Fed. Reg. 22962.

However, neither the April 17, 1979 proposed specific standards for the noise generated by refrigerator cars, nor the proposed property line standards for noise emanating from facilities were ever adopted. The EPA promulgated the final standards for specific sources of railroad noise on January 4, 1980, and explicitly rejected promulgating a source standard for refrigerator cars at that time. 45 Fed. Reg. 1252, 1258 (1980). In the January 4, 1980 announcement, the EPA also stated its intention to defer promulgation of final railyard property line standards pending further assessment of the extensive comments that it had received on those standards. *Id.* at 1256. In announcing that property line standards would be established at a future date, the EPA indicated that such property line regulations "will include the control of a wide variety of rail equipment and facilities associated with

§ 201.10. The refrigerated trailers and containers at issue in the present case are not mentioned in the regulations. Defendants contend that the alleged regulatory gap created by the

absence of standards for refrigerated rail cars also exists with respect to refrigerated trailers and containers, since the latter are the technological successors of the former.

yard activity that is not specifically covered by the four source standards." *Id.*[2]

However, the property line standards were ultimately deemed unnecessary. The EPA withdrew further consideration of those standards. The Status Report of November 12, 1981, filed by the parties to the *Costle* litigation, stated the EPA's rationale for ultimately declining to adopt the proposed property line standards:

> Respondents believe that the cumulative effect of these standards [the final standards for specific sources of railroad noise, 45 Fed.Reg. 1252 (1980)], which were based on the noise abatement achievable through the application of the best available technology taking into consideration the cost of compliance, effectively regulate both railroad equipment and railroad facilities. The standards promulgated to date cover the major sources of noise from railroad equipment which in turn generate a large proportion of the noise emissions from rail facilities. Since the cumulative effect of regulating equipment used within railyards is also to regulate to a significant degree noise emissions from rail facilities, the parties agree that it is unnecessary for EPA to establish further property line facility emission standards specifically for railyards.

> In consideration of these facts, EPA intends to withdraw its proposal to promulgate a property line standard for rail facilities. Respondents agree with Petitioner AAR that EPA has already effectively regulated railroad "equipment and facilities" in a manner "consistent with the customary usage of the phrase in the railroad industry," 562 F.2d at 1321, and in a manner consistent with the criteria contained in Section 17 of the Noise Control Act, and that national uniformity of treatment is effectively assured as the Federal standards become effective.[3]

■ In light of the foregoing history of the federal regulations controlling railroad noise, defendant's "regulatory gap" argument must fail. It is clear that the EPA has expressly considered and rejected regulations of those noise sources that the State of Delaware seeks to control in the present case. Besides rejecting a proposed specific noise standard for refrigerator rail cars, the EPA also rejected proposed property line standards that were intended, in part, to regulate the noise generated by "TOFC/COFC" operations. The EPA concluded that the proposed property line standards were unnecessary, because the standards already controlling specific sources of railyard noise were deemed sufficient to control the noise emissions from rail facilities themselves.

The instant case is thus like those which recognize that a federal decision not to regulate has the same preemptive effect as a federal decision to regulate. As the Supreme Court has recognized on a number of occasions:

> [A] federal decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate.

*Arkansas Elec. Co-Op. Corp. v. Arkansas Public Commission*, 461 U.S. 375, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983); *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 1004, 55 L.Ed.2d 179 (1977).

In support of its argument that the lack of a federal *noise* standard pertaining to refrigerated rail cars invites supplementary state regulation, the defendants point to the language of the preemption clause of

---

**2.** On September 30, 1980, EPA published "Notice of availability of new data and advance notice of intent." In that Notice, EPA expressed its intent to consider specific noise standards for "parked cars with mechanical refrigeration units, and trailer on flat car/container on flat car facilities [TOFC/COFC]." 45 Fed.Reg. 64876–77 (1980).

**3.** On December 1, 1982, EPA published a formal "Withdrawal of proposed standards," in which it announced its determination to reject the proposed property line standards in accordance with the decision by the parties to the *Costle* litigation. 47 Fed.Reg. 54107–54108 (1982).

the Act. In pertinent part the preemptive language of the Act recites:

> ... after the effective date of a regulation under this section applicable to noise emissions resulting from the operation of any equipment or facility of a surface carrier engaged in interstate commerce by railroad, no State or political subdivision thereof may adopt or enforce any standard applicable to noise emissions resulting from the operation of the same equipment or facility of such carrier unless such standard is identical to a standard applicable to noise emissions resulting from such operation prescribed by any regulation under this section.

42 U.S.C. § 4916(c)(1). Defendants argue that, when read literally, the statute preempts state regulation of noise from the operation of equipment or facilities *only* where the noise is covered by a federal regulation. I cannot agree with the defendants' reading of the preemption clause, particularly where as here, the EPA expressly considered and rejected standards for those noise sources that the State of Delaware is now seeking to control. Adopting the construction of the preemption clause advocated by defendants would permit states to regulate railyard equipment and facilities whenever the federal government made the conscious decision that further regulation was unnecessary. Such a result would be at odds with the Act's express purpose to establish nationally uniform standards in the control of railroad and other major sources of noise. 42 U.S.C. § 4901(a)(3).

The defendants also argue that the EPA itself has acknowledged the existence of a federal regulatory gap in its standards relating to railyard noise into which the states may inject their own regulations. Defendants argue that the April 17, 1979 EPA proposal establishing a sound level standard for refrigerator car noise and a property line standard (which took into account the noise generated by TOFC/COFC operations) shows that the EPA did not read its existing regulations to apply to

these noise sources. While the defendants' argument may be correct insofar as it goes, it misses the most salient aspect of the history of the proposed standards relating to refrigerator car noise and property line standards, namely that the EPA rejected final promulgation of these standards because they were deemed *unnecessary*.

### B. *Irreparable Harm*

The moving party on a motion for a preliminary injunction bears the burden of demonstrating an imminent threat of irreparable harm. *Punnett v. Carter*, 621 F.2d at 586. I conclude that the plaintiffs have met that burden in the present case.

On August 1, 1984, plaintiffs' attorneys met with representatives of DNREC to discuss noise emissions from the Wilsmere facility. At this meeting, the plaintiffs were informed by DNREC that the refrigerated trailers were the noise source of greatest regulatory concern. Charles Wilkins, a DNREC representative, also informed plaintiffs that a noise attenuation of 29 decibels was necessary to comply with Delaware regulations. Two weeks later, plaintiffs were informed by DNREC that on or about August 20, 1984, the State of Delaware would initiate an action seeking to enforce its Noise Control Act against plaintiffs' operations at the Wilsmere Facility. Plaintiffs were also informed at that time that the State's enforcement action would include a request for immediate injunctive relief.[4]

In order to determine the expense and difficulty of achieving the 29 decibel noise reduction required by the State, plaintiffs consulted Grant Anderson, a physicist and acoustical engineer who specializes in railroad and highway transportation noise and its mitigation. Anderson Aff. ¶ 3. Anderson concluded that a 29 decibel noise reduction could be obtained by: (1) employing yet to be designed enclosures that would envelope refrigeration units—a reduction of 7 dBA; (2) constructing a 20 foot high sound barrier along plaintiffs' northern property line—a reduction of 6 dBA; and

4. Affidavit of William Manning.

(3) moving the trailers with refrigeration units to a location 600 feet from the spot at which the DNREC's measurements were taken—the remaining 16 dbA reduction. Anderson Aff. ¶ 45.

This three phase compliance program was in turn reviewed by John Giles, the general manager for TOFC/COFC operations for plaintiff B & O. Giles Aff. ¶ ¶ 1, 28. Giles concluded that the Wilsmere facility would be forced to shut down completely if such compliance were required. Moreover, in the event of a shutdown, the B & O intermodal facilities in Philadelphia and Baltimore would not be available as feasible alternatives. The Philadelphia facility is physically incapable of absorbing the additional traffic; and, use of the Baltimore facility would entail the non-competitive additional costs of drayage to and from northeastern markets in and out of Baltimore. Giles Aff. at ¶ 25.

As to the obstacles preventing implementation of Anderson's three phase compliance program, Giles attested that the Wilsmere facility simply does not have the space necessary to permit removal of the refrigeration units to a location 600 feet from neighboring properties. *Id.* at ¶ 29. If forced to comply with the 600 foot relocation requirement, the facility would only have enough space to accommodate 40 refrigeration trailers. *Id.* at ¶ 29(A). While the daily average number of refrigeration units at the facility is thirty-three, *id.* at ¶ 18, during peak periods, the number of refrigeration units grows to one hundred twenty. *Id.* at ¶ 29(C).

In addition, the costs of the twenty foot sound barrier ($1.2 million), the costs of the enclosures that would envelope the refrigeration units, as well as the costs attributable to the increased labor and machinery that would be necessary to mount and remove the enclosures would price the Wilsmere Facility "out of the competition." *Id.* at ¶ 29(B).

Giles' contentions concerning the impact that a 29 decibel noise reduction requirement would have upon plaintiffs' opera-

tions at the Wilsmere Facility stand largely uncontradicted on the present record.

The defendants nonetheless raise several arguments. First, defendants contend that the plaintiffs cannot base their claim of irreparable harm on the ground that they would be forced to reduce noise emissions at the Facility by 29 decibels. Defendants claim that the 29 decibel figure was not the basis of the contemplated state enforcement action.

The plaintiffs were informed by a representative of DNREC that compliance with the Delaware Act required noise abatement of 29 decibels; two weeks later, the plaintiffs were informed that the State of Delaware would shortly initiate an action under the Delaware Act against plaintiffs' operations at the Wilsmere Facility. There is no suggestion in the present record that defendants ever informed the plaintiffs that some calculation, other than the 29 decibel limitation, would form the basis of the threatened action. Under these circumstances, the plaintiffs are justified in basing their argument of irreparable harm upon the 29 decibel attenuation requirement.

The defendants further argue that the only harm facing the plaintiffs is the cost of litigating the threatened state enforcement action and that the costs of such litigation, as a matter of law, do not constitute irreparable harm. In addition, relying upon *A.O. Smith Corp. v. FTC*, 530 F.2d 515 (3d Cir.1976), and this Court's decision in *Pharmaceutical Manufacturers Ass'n v. FDA*, No. 77–291, Slip Op. (D.Del. October 5, 1977), the defendants contend that, even if the losses facing the plaintiffs go beyond the mere costs associated with litigation, those costs amount to no more than loss of profits resulting from the costs of complying with a governmental regulation, and cannot, therefore, constitute irreparable harm.

■ Clearly, however, the plaintiffs have established that they face injury considerably greater than that associated with the

mere costs of litigation.[5] I also conclude that the plaintiffs are threatened with harm that is greater than the mere loss of profits if preliminary relief does not issue.

Giles averred that the Wilsmere facility faces "numerous" direct and indirect area competitors in the transportation business. Giles Aff. ¶¶ 23–26. As previously noted, he also stated that the costs of compliance with Anderson's noise reduction plan would "price the facility out of the competition." Moreover, it would appear from Giles' assertions that, during "peak periods", the Facility would no longer be able to accommodate a significant portion of its refrigeration trailer traffic. Giles asserted that the daily peak number of refrigerated trailers at the Facility was 120, but that the 600 foot relocation requirement would limit the Facility to a capacity of 40 such trailers.

The defendants have not seriously challenged Giles' assertions concerning the nature of the harm that would befall the Facility in the event compliance with the threatened 29 decibel noise reduction was required. I view this harm as considerably more serious than the mere loss of profits attendant upon compliance with a government regulation. *See Northern Natural Gas v. United States Dept. of Energy*, 464 F.Supp. 1145, 1158 (D.Del.1979) (where this Court interpreted *A.O. Smith v. F.T.C.* as permitting a finding that lost profits can constitute irreparable harm if they are "peculiar", that is, if the lost profits constitute a loss greater than the "normal cost of doing business in today's world of government regulation.") The plaintiffs here face not only loss of revenue, but they stand to lose their competitive position in the north-

eastern region of the country, if, as Giles asserts, compliance with the threatened action would require increased rates for customers, as well as reduction in refrigerator trailer operations at the Facility.

### C. *The Public Interest*

In determining whether a preliminary injunction will issue, a court should, where relevant, consider the potential harm that a grant or denial of preliminary relief will have on the public interest and other interested parties. *Punnett v. Carter*, 621 F.2d at 582.

The defendants assert that the public interest favors the State's enforcement of its noise regulations. In support of their position, the defendants have submitted a number of affidavits by homeowners living near the Facility who complain that the noise from the Facility has adversely affected their lives in a variety of ways.

While these complaints of noise-related stress are not to be taken lightly, there is a competing and equally important public interest in the present case that favors issuance of preliminary injunctive relief.

In the Noise Control Act, Congress expressed the need for "national uniformity of treatment" in regulating major sources of noise. 42 U.S.C. § 4901(a)(3). With respect to the control of railroad noise, Congress has attempted to ensure such uniformity by including a direct and express preemption clause in the statute. 42 U.S.C. § 4916(c)(1). Implicit in this concern with national uniformity is Congress' perception that the public interest is best served by uniform noise regulations throughout the

---

5. Defendants argue that the only immediate threat of irreparable injury which plaintiffs have shown is the threat of having to pay the legal expenses necessary to defend a state enforcement action. Implicit in this argument is the assumption that plaintiffs have available to them the option of continuing to do business as usual during the pendency of the threatened state court enforcement proceedings and that the only detriment to plaintiffs during this period will be the cost of their defense. This contention overlooks two things. First, the Delaware Regulations are self-enforcing in the sense that any violation of them is subject to a

fine, with each day of noncompliance constituting a separate offense. "Willful" or "negligent" violations expose the violator to a fine of up to $3,000 per day. Second, the undisputed Manning affidavit indicates that when plaintiffs' counsel were advised by DNREC that it was about to initiate an enforcement action, they were also advised that immediate injunctive relief would be sought. The threat of coercive enforcement was thus real and imminent when this action was commenced. Plaintiffs sought protection from that threat in this Court, as it is conceded they had a right to do.

nation. In the absence of uniform regulations, carriers would be subject to a variety of differing state and local regulations, resulting in confusion and undue burdens upon the orderly flow of goods between the states. The disruption and alteration in operations that will occur at the Wilsmere Facility in the absence of preliminary relief is precisely the type of situation that Congress has determined is contrary to the public interest.

▉ Based on the current record, I am unable to conclude that the harms suffered by the homeowners surrounding the Facility significantly outweigh the harm to the public interest that would result if the Facility and the interstate carriers using it were forced to adjust their operations to the requirements of the Delaware Act.[6]

▉ Defendants' final argument is that plaintiffs have abused their privileges under the Temporary Restraining Order, and therefore are not entitled to a preliminary injunction. Specifically, defendants claim that plaintiffs expanded their operations at the Wilsmere Facility after the Temporary Restraining Order went into effect.

"[T]he proper standard to determine the status quo is the last uncontested status which precedes the pending controversy." *American Can Co. v. Local U. 7420, United Steelworkers of America*, 350 F.Supp. 810, 812 (E.D.Pa.1972) (citing *Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292, 293 (3d Cir.1940)). Based on the current record, defendants have failed to persuade me that the plaintiffs' conduct, while the TRO was in effect, was different from their conduct prior to the present dispute. While the plaintiffs may have expanded their operations, there is no evidence that their intention to do so prior to this controversy was not well known to defendants. More importantly, it would appear from defendants' own contentions that the physi-

cal expansion at the Wilsmere Facility of which they complain had begun prior to the defendants' threatened enforcement of the Delaware Act. *See* Defendants' Brief at 6.

For the foregoing reasons, plaintiffs' request for a preliminary injunction will be granted.

---

6. In this regard, it should be noted that the Noise Control Act permits states to enforce regulations directed at railroad noise "if the Administrator, after consultation with the Secretary of Transportation, determines that such standard ... is necessitated by special local conditions and is not in conflict with regulations promulgated under this section." 42 U.S.C. § 4916(c)(2) The defendants in the present case have not sought the EPA's permission to enforce their local noise regulations.