The BALTIMORE AND OHIO RAIL-
ROAD COMPANY, d/b/a One of the
Chessie System Railroads; the Balti-
more and Philadelphia Railroad Com-
pany, d/b/a One of the Chessie System
Railroads; Mount Clare Properties (De-
laware), Inc; and Chessie Motor Ex-
press, Inc.

v.

Charles M. OBERLY, III, Attorney Gen-
eral of the State of Delaware and John
E. Wilson, III, Secretary of the Depart-
ment of Natural Resources and Envi-
ronmental Control of the State of Dela-
ware.

**Appeal of Charles M. OBERLY, III
and John E. Wilson, III.**

No. 85–5272.

United States Court of Appeals,
Third Circuit.

Argued Nov. 18, 1985.

Reargued Aug. 3, 1987.

Decided Jan. 8, 1988.

As Amended Feb. 12, 1988.

John J. Polk (argued), Deputy Atty. Gen., Delaware Dept. of Justice, Wilmington, Del., for appellants.

F. Henry Habicht, II, Asst. Atty. Gen., Peter R. Steenland (argued), Karen L. Florini, Land and Natural Resources Div., U.S. Dept. of Justice, Francis S. Blake, Gen. Counsel, Nancy Ketcham–Colwill, U.S.E. P.A., Washington, D.C., for amicus curiae U.S.

William E. Manning (argued), Jeffrey S. Estabrook, Duane, Morris & Heckscher, Wilmington, Del., for appellees.

Richard J. Flynn (argued), Kevin Hawley, Sidley & Austin, Washington, D.C., for amicus curiae The Ass'n of American Railroads.

Before HIGGINBOTHAM, SLOVITER and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This interlocutory appeal, returned to us by the United States Supreme Court, raises a legal question under the Supremacy Clause: whether Delaware's noise control statute and regulations thereunder are facially preempted by section 17 of the Noise Control Act of 1972, 42 U.S.C. § 4916(c) (1982). Because we conclude that the state regulatory scheme at issue in this appeal is not facially preempted by the federal statute, we will vacate the district court's order preliminarily enjoining enforcement of Delaware's noise control statute and regulations against a Delaware shipping facility, and we will remand this matter for further proceedings consistent with this opinion.

## I. FACTUAL & PROCEDURAL BACKGROUND

The Wilsmere shipping facility, located in northern New Castle County, Delaware, handles both rail and trucking operations (i.e., it is "intermodal" in nature). In addition to the noise produced by a typical railyard, the Wilsmere intermodal facility generates noise through the operation of two types of refrigerated shipping units, trailers on flat cars ("TOFCs") and containers on flat cars ("COFCs"). TOFCs and COFCs, which are transferred as "piggyback" units to and from truck trailers and railroad flatcars, produce noise because their refrigerator components (generators or compressors) operate continuously, keeping these units cold as they await transport out of the facility.

The Wilsmere facility is located directly adjacent to the residential communities of Brack–Ex, Elsmere and Roselle, Delaware. Prior to 1983, the appellee-owners used their Wilsmere facility as a rail switching yard. Its operations then, which included the movement of locomotives and the movement and coupling of railcars, produced intermittent noise of limited duration. Beginning in late 1983, intermodal operations at the facility increased dramatically. Not surprisingly, noise-related complaints by neighboring residents also began to increase at this time.

This action was triggered in August 1984 when appellant Wilson, Secretary of the Delaware Department of Natural Resources and Environmental Control, informed counsel for one of the appellee corporations (collectively, "the Chessie group") that Delaware's Department of Justice was preparing to bring an action under the Delaware Noise Control Act, 4 Del.Code Ann. tit. 7, §§ 7101–7125 (1983), and the regulations thereunder. This impending action was to seek injunctive relief against alleged noise violations at the Chessie group's Wilsmere intermodal facility. The Chessie group responded to the threat of state legal action by filing this federal

action. On constitutional grounds, they sought to restrain Secretary Wilson and appellant Oberly, Delaware's Attorney General, from acting in their official capacities to apply and enforce state noise control provisions. The Chessie group's motion for a temporary restraining order was granted by the district court after a hearing on August 20, 1984, and their request for a preliminary injunction was granted on Supremacy Clause grounds on April 9, 1985. *Baltimore & O.R.R. Co. v. Oberly*, 606 F.Supp. 1340 (D.Del.1985) (*"B & O R.R."*).

## II. APPELLATE PROCEEDINGS

Secretary Wilson and Attorney General Oberly took an interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1) (1982) from the district court's order granting the Chessie group's motion for a preliminary injunction. On October 18, 1985, this Court invited the United States Environmental Protection Agency ("EPA") to express its legal views on the Supremacy Clause issue. In compliance with our request, EPA filed a nine-page legal memorandum. The EPA concluded that the Delaware noise regulation that would have formed the basis of the threatened state legal action was preempted by EPA's prior actions under federal law. After oral argument by the parties on November 18, 1985, we affirmed the judgment of the district court. *Baltimore & O.R.R. Co. v. Oberly*, 782 F.2d 29 (3d Cir.) (*per curiam*), *vacated and remanded*, —— U.S. ——, 107 S.Ct. 562 (1986) (*mem.*). In our published opinion, after noting our agreement with the district court's reasoning, we explicitly noted the fact that

> EPA ... agreed that section 17 of the [federal] Noise Control Act preempts the Delaware standard where EPA has adopted federal standards regulating noise from railroad facilities and, further, [where EPA] has considered and then declined to prescribe a federal property line [noise] standard for railroad facilities on the ground that it is unnecessary.

782 F.2d at 30.

Pursuant to 28 U.S.C. § 1254(2) (1982), Oberly and Wilson then appealed our judg-

ment to the United States Supreme Court. The Court, before it acted upon the jurisdictional statement filed by appellants, invited the Solicitor General to file a brief expressing the views of the United States. *Oberly v. Baltimore & O.R.R. Co.*, 476 U.S. 1181, 106 S.Ct. 2912–13, 91 L.Ed.2d 542 (1986). In response to the Court's request, the Solicitor General filed an *amicus* brief taking the position that EPA's 1982 decision that property line noise regulations were unnecessary, discussed *infra*, does *not* preempt Delaware's noise regulations. The Solicitor General also noted that,

> [r]egrettably, because of a failure of communication within the Department of Justice, [the EPA] brief was filed in the court of appeals without having been brought to the attention of either the Assistant Attorney General for Land and Natural Resources or the Solicitor General, and therefore [was filed in this Court] without the former's approval or the latter's authorization.

Brief for the United States as Amicus Curiae at 6 n. 6, *Oberly v. Baltimore & O.R.R. Co.*, —— U.S. ——, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986) (*mem.*).

The Supreme Court ultimately vacated our judgment and remanded this matter "for further consideration in light of the position presently asserted by the Solicitor General in his brief, as *amicus curiae*, filed November 10, 1986." *Oberly*, 107 S.Ct. 562. On remand, we requested an *amicus* brief from the United States and supplemental briefing by the parties. We also accepted an *amicus* brief from the Association of American Railroads ("AAR"), filed on behalf of the Chessie group. On August 3, 1987, we heard oral argument on behalf of the parties and *amici*. Because we now conclude that Delaware's regulations are not facially preempted by federal law, we will vacate the judgment of the district court.

## III. THE NOISE CONTROL LEGAL FRAMEWORK

Section 17 of the federal Noise Control Act of 1972 required the EPA's Adminis-

trator to "publish proposed noise emission regulations for surface carriers engaged in interstate commerce by railroad," 42 U.S.C. § 4916(a)(1) (1982), including "limits ... [that] reflect the degree of noise reduction achievable through the application of the best available technology, taking into account the cost of compliance." *Id.* Within ninety days of such publication, the Administrator was required to promulgate final regulations. 42 U.S.C. § 4916(a)(2) (1982).

Pursuant to this statutory command, the EPA—after first publishing proposed regulations, holding a public hearing and reviewing written comments—published final, but limited, railroad noise emission regulations on January 14, 1976. In a subsequent lawsuit, the Court of Appeals for the District of Columbia Circuit held that "the[se] original regulations were much too narrow in scope." *Association of Am. R.R. v. Costle*, 562 F.2d 1310, 1320 (D.C. Cir.1977) (emphasis deleted) ("*AAR*"). As the *AAR* court noted, these "standards regulat[ed] noise from only three sources: 1) locomotive operation under stationary conditions; 2) locomotive operation under moving conditions; and 3) rail car operations. No other types of railroad equipment and no railroad facilities *at all* [we]re within the coverage of the promulgated standards." *Id.* at 1315 (footnotes deleted; original emphasis). Given the Noise Control Act's directive that federal regulations limit "noise emissions resulting from operation of *the equipment and facilities* of surface carriers engaged in interstate commerce by railroad," 42 U.S.C. § 4916(a)(1) (1982) (emphasis added), the *AAR* court "conclude[d] that the EPA ... [had] interpreted its statutory mandate too narrowly in regulating only locomotives and rail cars, and *no* facilities at all." 562 F.2d at 1320 (original emphasis). The court thus ordered EPA to issue new final regulations concerning "the equipment and facilities" of interstate rail carriers, as that phrase is defined by the realities of the railroad industry, within one year. *Id.* at 1321–22.

In response to the *AAR* litigation, EPA proposed a package of regulations "establish[ing] standards for overall railroad facility and equipment noise, as well as spe-cific standards for retarders, refrigerator cars and car coupling operations." 44 Fed. Reg. 22,960 (1979), *reprinted in* Appendix ("App.") at A–193. Although additional final regulations were subsequently promulgated for other aspects of interstate rail operations, what is significant to this appeal is the fact that EPA decided *not* to promulgate a final noise source standard for refrigerator cars. EPA noted that this decision was made "in part to allow time to evaluate the effect of the[ ] declining use [of such rail cars]," 45 Fed.Reg. 1252, 1258 (1980), *reprinted in* App. at A–206, A–212, and also that "[t]heir function is being replaced by containers on flat cars (COFC) and truck-mounted (trailer) refrigerator units on flat cars (TOFC)...." *Id.* Although EPA noted its "expect[ation]" that it would issue regulations in this area in January 1981, *id.*, no such promulgation ever occurred.

In November 1981, the parties to the *AAR* litigation filed a "Status Report" with the Court of Appeals. This report informed the court of EPA's conclusion, shared by all of the parties, that, given the additional regulations it had promulgated since the *AAR* decision, "no further [noise] standards [we]re necessary to regulate rail facilities and equipment." *AAR*, Status Report at 3 (D.C.Cir. Nov. 12, 1981), *reprinted in* App. at A–230. This conclusion stemmed from a belief "that the cumulative effect of the[ ] standards ... [was the] effective[ ] regulat[ion of] both railroad equipment and railroad facilities. The standards promulgated [by that] date cover[ed] the major sources of noise from railroad equipment [that] in turn generate[s] a large proportion of the noise emissions from rail facilities." *Id.* at A–230–31. Accordingly, the parties submitted an agreement to dismiss the *AAR* appeal pursuant to Fed.R.App.P. 42(b), *id.* at A–234–35, and the court ordered the action dismissed on November 24, 1981. EPA then published a notice reflecting this agreement of the *AAR* parties. EPA thus officially withdrew its previously proposed standard for refrigerator cars as well as a railyard property line noise standard that it also had

proposed subsequent to the *AAR* court decision. 47 Fed.Reg. 54,107–08 (1982), *reprinted in* App. at A–236–37. In the five years since EPA published that notice withdrawing its proposed regulations, there has been no additional federal regulatory activity in this area.

The background of Delaware's regulatory efforts to control noise emissions is far less complicated. Pursuant to the state noise control statute, a noise regulatory scheme, reproduced in the Appendix at A–24–33, was approved by Secretary Wilson on January 20, 1982. Relevant to this appeal is Section 71–I–6.02 of the Delaware regulations, which defines an "Intrusive Noise Level."

> ... A SOURCE SHALL BE CONSIDERED TO CAUSE A NOISE DISTURBANCE IF THE SOUND LEVEL, OTHER THAN AN IMPULSE, INFRASONIC OR ULTRASONIC SOUND, EMITTED BY SUCH SOURCE EXCEEDS THE AMBIENT NOISE LEVEL BY 10 dBA[1] WHEN MEASURED AT THE POINT OF COMPLAINT ORIGINATION WITHIN THE RECEIVING PROPERTY.

App. at A–32 (footnote added). In common parlance, this noise regulation is called a "property line" standard.

## IV. PREEMPTION ANALYSIS

### A. *Standard of Review*

At the oral argument during our first encounter with this appeal, counsel for the Chessie group and for appellants Oberly and Wilson agreed that, since neither side contemplated introducing additional evidence in the district court, we should treat this as an appeal from the award of a permanent, as opposed to a preliminary, injunction. *Baltimore & O.R.R. Co. v. Ob-*

erly, No. 85–5272, transcript of oral argument at 24 (3d Cir. Nov. 18, 1985). The parties continue to stipulate that this appeal should be so viewed. While the terms of an injunction are reviewed for abuse of the district court's discretion, the determinations underlying an injunction are reviewed under their appropriate standards—factual determinations will not be faulted unless they are clearly erroneous, but legal determinations are given plenary review. *E.g. John F. Harkins Co., Inc. v. Waldinger Corp.,* 796 F.2d 657, 658 (3d Cir.1986), *cert. denied sub nom. TWC Holdings, Inc. v. John F. Harkins Co., Inc.,* — U.S. —, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987). The district court judgment awarding an injunction to the Chessie group was, at the threshold, based upon a legal determination: that it had demonstrated a reasonable probability that it would succeed on the merits of its federal preemption argument. *B & O R.R.,* 606 F.Supp. at 1342. Accordingly, our standard of review on this issue is plenary.

### B. *Statutory Interpretation*

We begin our analysis by reciting the analytical scheme that has guided the Supreme Court's preemption analysis.

> "[S]tate law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. [*Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190,] 203–204 [103 S.Ct. 1713, 1721–1722, 75 L.Ed.2d 752 (1983)]; *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664] (1982); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947).

---

1. "dBA" is a decibel measurement. Because the dBA scale is logarithmic, each increase of 10 dBA is, to the ear, a perceived doubling of sound.

In this case, the record contains evidence of noise measurements taken in 1984, outside the property line of the Wilsmere facility, by Delaware's Department of Natural Resources and Environmental Control. These measurements show that the area background noise level with-

out TOFCs and COFCs running was 52 dBA, while the average noise level with the refrigerator units running was 78–79 dBA. App. at A–132 (affidavit of Charles W. Wilkins, III). The evidence also indicates that efforts to obtain ambient noise level readings at locations in the adjacent residential neighborhoods "failed because the noise emitted by refrigerator units at the Wilsmere Intermodal Facility drowned out all other noise sources." *Id.* at A–131 (same).

If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248] (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941)."

*California Coastal Comm'n v. Granite Rock Co.,* —— U.S. ——, 107 S.Ct. 1419, 1425, 94 L.Ed.2d 577 (1987) (*"California Coastal"*) (quoting *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)) (brackets in *California Coastal*); *accord Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157–58, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Jersey Cent. Power & Light Co. v. Township of Lacey,* 772 F.2d 1103, 1110 (3d Cir.1985), *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986). In short, " 'the question whether a certain state action is pre-empted by federal law is one of congressional intent. " 'The purpose of Congress is the ultimate touchstone.' " ' " *Pilot Life Ins. Co. v. Dedeaux,* —— U.S. ——, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (internal citations omitted).

In this appeal, the Chessie group, joined by *amicus* AAR, claims that state regulation is at odds with the federal purpose underlying the statute, that Congress has, by directing EPA to regulate the noise emissions of interstate rail facilities, entirely displaced all such regulation by the states, and that the Delaware property line noise regulation actually conflicts with a federal decision not to regulate under the Noise Control Act. We will address these claims by first examining and interpreting the language of the federal statute.

■ Section 17(c) of the federal Noise Control Act explicitly provides that regulations promulgated thereunder preempt state and local noise standards and controls:

[A]fter the effective date of a regulation under this section applicable to noise emissions resulting from the operation of any equipment or facility of a surface carrier engaged in interstate commerce by railroad, no State or political subdivision thereof may adopt or enforce any standard applicable to noise emissions resulting from the operation of the same equipment or facility of such carrier unless such standard is identical to a standard applicable to noise emissions resulting from such operation prescribed by any regulation under this section.

42 U.S.C. § 4916(c)(1) (1982). Section 17(c) does not, however, indicate a federal intent to occupy the field of railroad noise control. The existence of section 17(c) itself makes this clear, for a statutory provision explaining when and how state regulation is to be preempted would hardly be necessary in a statute manifesting Congress's intent to occupy a particular regulatory field. In addition, the subsection that immediately follows the preemption provision just quoted delineates the power of the EPA Administrator to determine that state environmental and product noise regulations are "necessitated by special local conditions and [are] not in conflict with [federal] regulations...." 42 U.S.C. § 4916(c)(2) (1982). The general statutory statement of congressional policy—which declares that "Federal action is essential to deal with major noise sources in commerce[,] control of which require[s] national uniformity of treatment," 42 U.S.C. § 4901(a)(3) (1982), and which played a role in the district court's legal determination, *see B & O R.R.,* 606 F.Supp. at 1345—is not to the contrary. Such a passing and introductory legislative declaration has never, standing alone, sufficed to demonstrate federal occupation of a regulatory field. Indeed, this same provision begins by noting that "primary responsibility for control of noise rests with State and local governments...." 42 U.S.C. § 4901(a)(3) (1982).

■ We believe that the plain language of the preemption section justifies a narrow interpretation of its effects. Section 17(c)(1) concerns preemption in the context

of *specific* federal noise regulations. It decrees that preemption occurs after the effective date of *"a* regulation," and it is focused upon any state noise regulation of "emissions resulting from *the* operation of *the* same equipment or facility...." 42 U.S.C. § 4916(c)(1) (1982) (emphasis added). In addition, it exempts from its zone of preemption any *"such* standard [that] is identical to *a* standard applicable to noise emissions resulting from *such* operation prescribed by *any* [federal] regulation...." *Id.* (emphasis added). We conclude—as each of the italicized articles suggests—that section 17(c)(1) simply is not a global preemption provision. To the contrary, it provides only that each federal noise regulation, once enacted, bars direct state regulations of noise emissions by the same rail facility or equipment (unless the state regulation *mirrors* the federal regulation), and it in no way suggests that Congress meant for the adoption of *any* federal noise regulation to bar or displace every state effort to regulate the noise emissions of interstate rail carriers.

While our interpretation of section 17(c)(1) is grounded primarily in our reading of the plain statutory language, we also find some, albeit modest, support for a narrow reading of this preemption clause in the relevant, albeit sparse, legislative materials. Although a number of members of Congress offered their views on the record, the statement that casts the most light on the precise issue we face is the effort of Senator John V. Tunney (D.Cal.), in the Senate debate of October 18, 1972, to "stress ... that the preemption provided ... only occurs in areas of regulation where adequate Federal regulations are in effect." Science Policy Res. Div. of the Congressional Res. Serv., 93d Cong., 2d Sess., *A Legislative History of the Noise Control Act of 1972* 40–41 (Comm.Print 1974) (*"Legislative History"*). This statement is the only remark we have found in the congressional materials that gives con-

text to other remarks, of Senator Tunney [2] and others, that, viewed in isolation, point to a conclusion opposite to the one we reach in this decision. *See, e.g., id.* at 190 ("[W]e put in the preemption so that we would give the railroads ... some awareness and some security that they would not have to abide by 50 different State jurisdictions and Lord knows how many tens of thousands of local jurisdictions. It is in the bill now. It is a complete preemption.") (statement of Sen. Tunney, Senate debate, Oct. 13, 1972). As we read the legislative history, Congress expected that EPA would promulgate comprehensive federal regulations governing the rail facilities and equipment that generate significant noise. *See generally AAR*, 562 F.2d at 1312. Congress, in short, seems to have contemplated "complete" preemption as the obvious consequence of the "complete" federal regulation they anticipated. *See, e.g., Legislative History* at 126 ("After the effective date of an *adequate* Federal regulation *program*, the authority of State and local governments to regulate noise from interstate ... trains is completely preempted....") (statement of Sen. Jennings Randolph (D.W.Va.), Senate debate, Oct. 12, 1972) (emphases added). Because EPA ultimately promulgated only selected, as to opposed to global, regulations, however, we believe that the legislative history indicates, as does the plain language of the statute, an intention that the resulting preemption of state noise regulation be similarly *in*complete.

We therefore conclude that section 17(c) means what it says: once a federal noise regulation has taken effect, a state may not regulate (unless it promulgates a standard that is "identical to a [federal] standard," 42 U.S.C. § 4916(c)(1) (1982)) the same rail equipment or facility. Since EPA has regulated neither TOFCs nor noise emissions at railyard property lines, the federal Noise Control Act and the regulations thereunder do not preempt the mere

---

**2.** Analyzing this legislative history in the context of airline noise regulation, the Supreme Court once noted that "[t]he statements by ... Senator Tunney are weighty ones. For ... Senator Tunney was a member of the Senate Committee on

Public Works, which submitted the [Noise Control] Act and Report." *City of Burbank v. Lockheed Air Terminal Inc.,* 411 U.S. 624, 637, 93 S.Ct. 1854, 1861, 36 L.Ed.2d 547 (1973).

existence of Delaware's regulations of such equipment and facilities.

### C. *The Federal Decision Not to Regulate*

 The district court did not base its legal judgment on a contrary interpretation of the statute. It relied, instead, on EPA's decision that noise regulation of refrigerator cars and a railyard property line noise standard were "unnecessary." 47 Fed. Reg. 54,107, 54,108 (1982), *reprinted in* App. at A–236–37. The district court found it

> clear that the EPA has expressly considered and rejected regulations of those noise sources that the State of Delaware seeks to control in the present case.... The instant case is thus like those which recognize that a federal decision not to regulate has the same preemptive effect as a federal decision to regulate.

*B & O R.R.*, 606 F.Supp. at 1344. We disagree. Although the district court was certainly correct to note that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision to regulate," *Arkansas Elec. Coop. Corp. v. Arkansas Public Comm'n*, 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983) (*"Arkansas Electric"*) (original emphases), we are not convinced that EPA's purpose in 1982 was to perpetuate a noise control regulatory gap.

We begin by noting that, "because agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclusive." *Hillsborough County v. Automat-*

*ed Medical Laboratories, Inc.*, 471 U.S. 707, 718, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985); *accord California Coastal*, 107 S.Ct. at 1426 ("it is appropriate to expect an administrative regulation to declare any intention to preempt state law with some specificity"). In this context, where the question is whether an administrative decision *not* to regulate should have the same preemptive effect as would a decision *to* regulate, we see no reason to expect any less of an agency. Indeed, because this "passive" context offers little else from which one can infer anything of an agency's intention, we believe that it is essential that an agency declare, at a high level of specificity, its intention that its *in*action preempt state law before we may assume such a desire and give it legal effect.[3] In this case, of course, EPA did nothing of the sort. Administrator Anne M. Gorsuch's notice withdrawing the proposed standards simply stated that "it was agreed by the [parties to the *AAR* litigation] that it was unnecessary for EPA to establish further property line facility emission standards." 47 Fed.Reg. 54,107, 54,108 (1982), *reprinted in* App. at A–236–37. The Administrator concluded, "[i]n view of the foregoing[,] ... that [EPA] ... satisfied its statutory requirements ... and that the proposed [property line and refrigerator car noise] standards [we]re unnecessary." *Id.*

Our conclusion that this decision not to regulate is, on its face, insufficient to preempt Delaware's noise regulatory scheme is bolstered by the peculiar litigation situation in which the federal property line and refrigerator car noise regulations were first proposed and then withdrawn. The *AAR* appellate judgment was based upon the court's rejection of EPA's initial contention that this area should be left to state regulation. The United States argues, and we are persuaded, that EPA's reluctance to regulate *at all* counsels that its subsequent conclusion—that additional

---

**3.** *Cf. Ray,* 435 U.S. at 172, 98 S.Ct. at 1002. ("It may be that [federal] rules will be forthcoming that will pre-empt the State's present ... rule, but until that occurs, the State's requirement need not give way under the Supremacy Clause."); *United Steelworkers of Am., AFL–CIO–CLC v. Auchter,* 763 F.2d 728, 733 (3d Cir.

1985) (construing OSHA regulation that provided "expressly that ... '[it] is intended to address comprehensively the issue of evaluating and communicating chemical hazards to employees in the manufacturing sector, and to preempt any state law pertaining to this subject'") (quoting 29 C.F.R. § 1910.1200(a)(2) (1984)).

regulations were "unnecessary"—should be given even less preemptive effect than would normally be the case, for this was not a "typical" agency decision not to regulate. We agree with this characterization. To the extent EPA's 1982 decision can be explained, we understand it as the *absence* of a real regulatory decision. This field, in short, still awaits definitive federal action, either on the side of regulation or on the side of no regulation at all. *See Ray,* 435 U.S. at 172–73 & n. 23, 98 S.Ct. at 1001–02 & n. 23. Until that occurs, we conclude that Delaware's noise regulatory scheme has not been facially preempted.

### D. *Preemption As Applied*

The Chessie group sought an injunction against "the threatened application of the Delaware Noise Control Act ... as ... invalid *per se* ... and ... invalid ... as applied...." App. at A–5 (Verified Complaint for Declaratory and Injunctive Relief). The injunction granted by the district court, however, was directed against the Act itself. *See B & O R.R.,* 606 F.Supp. at 1342. We have concluded that the district court's legal holding—that the federal scheme preempts Delaware's noise control provisions on their face—is erroneous. Lingering in the background of this dispute is the possibility, however, that some future *application* of the Delaware regulations to the Wilsmere intermodal facility may actually conflict with the federal scheme.

▮ Following the Supreme Court's lead, we will not, in this facial challenge to the mere existence of Delaware's noise control statute and regulations, "assume that such a hypothetical event is so likely to occur as to preclude [any state regulation] at all." *Arkansas Electric,* 461 U.S. at 389. "To defeat [a] facial challenge, [Oberly and Wilson] needed merely to identify a possible [application] of [state noise regulations] not in conflict with federal law."[4] *California Coastal,* 107 S.Ct. at 1431. We believe

that they, in hypothesizing the application of Delaware's property line regulation to the noise emitted by stationary TOFCs in the Wilsmere facility, have made that threshold showing. This is not to say that Delaware may apply its regulations that are not preempted by section 17(c)(1) in such a way that makes it impossible for the Chessie group to comply with both the federal and state regulations, or that erects an obstacle to the achievement of the federal purposes underlying the Noise Control Act. Such actual conflicts, if and when they actually occurred, could form the basis of an "as applied" preemption argument in future litigation. "[W]e hold only that ... this facial challenge[, brought to *forestall* the application of the Delaware noise regulations,] has not demonstrated any conflict." *Id.* at 1432.

## V. CONCLUSION

For the foregoing reasons, we will vacate the judgment of the district court and remand this matter for further proceedings consistent with this opinion.

---

**4.** *Cf. California Coastal,* 107 S.Ct. at 1429 ("By choosing to seek injunctive and declaratory relief against the [state] permit before discovering what conditions the Coastal Commission would have placed on the permit, ... Granite Rock's case must stand or fall on the question of whether *any possible* set of conditions attached to the Coastal Commission's permit requirement would be pre-empted.") (original emphasis).